**CASE NO. 23-5771**

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

KIMBERLY DIEI,

*Plaintiff-Appellant,*

-vs-

RANDY BOYD, *et al.,*

*Defendants-Appellees.*
_____

On Appeal from the United States
District Court for the Western District of Tennessee
(2:21-cv-02071-JTF-cgc)

**APPELLANT'S OPENING BRIEF**

GREG H. GREUBEL
  *Counsel of Record*
KATLYN A. PATTON
JT MORRIS
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street, Suite
1250
Philadelphia, Pennsylvania
19106
(215) 717-3473
greg.greubel@thefire.org
katlyn.patton@thefire.org
jt.morris@thefire.org

*Attorneys for Appellant*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: _____          Case Name: _____

Name of counsel: _____

Pursuant to 6th Cir. R. 26.1, _____
*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

<div style="border:1px solid">

CERTIFICATE OF SERVICE

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/_____

_____

_____

</div>

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................iv

STATEMENT REGARDING ORAL ARGUEMNT ...................................x

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUES ...............................................................2

INTRODUCTION ......................................................................................3

STATEMENT OF THE CASE ..................................................................4

    Defendants Twice Investigate Diei Because of Her
    Personal, Off-Campus Social Media Speech. ...................................4

    Diei Timely Sues, Then the District Court Dismisses
    Her Case Two Years After Defendants Moved for
    Dismissal. ...........................................................................................9

SUMMARY OF ARGUMENT .................................................................11

ARGUMENT ...........................................................................................16

    I.    Defendants Violated the First Amendment By
         Punishing Diei for Views She Expressed on Her
         Personal Social Media. .........................................................17

         A.    The First Amendment protects professional
               students' social media speech against
               viewpoint discrimination. .............................................18

         B.    Defendants unconstitutionally punished
               Diei for her viewpoints under the guise of
               "various professionalism codes". ...................................20

             1.    Professional school administrators
                   cannot invoke professionalism policies
                   as pretext to punish students for their
                   viewpoints. .........................................................20

2. Defendants unconstitutionally invoked the College of Pharmacy's "various professionalism codes" to punish Diei for her viewpoints. ................................. 23

C. Public professional schools cannot condition enrollment on a waiver of First Amendment rights. ........................................................... 26

II. Defendants' Decision to Expel Diei Was Unconstitutional Under Any Standard................................. 30

A. Adult professional students retain full First Amendment rights because the "special characteristics" of the K–12 environment are absent in higher education. ........................................... 31

B. Diei's off-campus speech was not disruptive or related to Defendants' legitimate pedagogical interests. ................................... 37

III. Defendant George Unlawfully Retaliated Against Diei Because She Believed Diei's Protected Speech Was "Vulgar." .................................................... 41

A. The First Amendment protects social media speech, even if a public official finds it "vulgar." .......................................................... 42

B. The specter of expulsion would deter a student of ordinary firmness from speaking. .............. 44

C. Chairperson George admitted that the Committee punished Diei because of her expression on social media. .......................................... 45

IV. Defendants George and Boyd Are Not Entitled to Qualified Immunity for Punishing Diei Because of Her Viewpoints......................................................... 47

A.    Fair notice is the touchstone of qualified immunity. ................................................................ 48

B.    Defendants violated clearly established law by punishing Diei because of her message. ................. 49

C.    Defendant George violated clearly established law by voting to expel Diei. ....................... 53

D.    Qualified immunity does not protect Defendants' considered decision to expel Diei under their professionalism policy. ............................ 55

V.    Defendants' Policy Is Overbroad and Vague, and Diei Has Standing to Challenge It. ....................... 57

A.    Diei's facial claims seek retrospective declaratory relief tied to her as-applied claims. ............................................................... 58

B.    Defendants' policy unconstitutionally limits expression and expressive conduct. ........................ 59

C.    Defendants' policy does not provide fair notice of what it proscribes. ....................................... 61

CONCLUSION ....................................................................... 63

# TABLE OF AUTHORITIES

**Cases:**                                                              **Page(s)**

*Al-Dabagh v. Case W. Rsrv. Univ,*
  777 F.3d 355 (6th Cir. 2015) ........................................................... 21, 22

*Am. Freedom Def. Initiative v. Suburban Mobile Auth.,*
  978 F.3d 481 (6th Cir. 2020) ................................................................ 61

*Anders v. Cuevas,*
  984 F.3d 1166 (6th Cir. 2021) ................................................... 42, 45, 47

*Ashcroft v. al-Kidd,*
  563 U.S. 731 (2011) ............................................................................... 48

*Barr v. Lafon,*
  538 F.3d 554 (6th Cir. 2008) ......................................................... 38, 60

*Bd. of Regents of Univ. of Wisc. Sys. v. Southworth,*
  529 U.S. 217 (2000) ............................................................................... 33

*Bell v. Johnson,*
  308 F.3d 594 (6th Cir. 2002) ............................................................... 45

*Bethel Sch. Dist. No. 403 v. Fraser,*
  478 U.S. 675 (1986) ............................................................... 40, 51, 52

*B.L. v. Mahanoy Area Sch. Dist.,*
  964 F.3d 170 (3d Cir. 2020) ................................................................. 52

*Blau v. Fort Thomas Pub. Sch. Dist.,*
  401 F.3d 381 (6th Cir. 2005) ......................................................... 58, 59

*Brown v. City of New York,*
  862 F.3d 182 (2d Cir. 2017) ................................................................. 55

*C1.G ex rel. C.G. v. Siegfried,*
  38 F.4th 1270 (10th Cir. 2022) ............................................................ 39

*Cahoo v. SAS Analytics Inc.*,
   912 F.3d 887 (6th Cir. 2019) ............................................................... 48

*Counterman v. Colorado*,
   600 U.S. 66 (2023) ............................................................................ 42

*DeJohn v. Temple Univ.*,
   537 F.3d 301 (3d Cir. 2008) ............................................................. 33

*DeJong v. Pembrook*,
   2023 WL 2572617 (S.D. Ill. Mar. 20, 2023) ......................................... 19

*Enders v. Ne. Ohio Medical Univ.*,
   938 F.3d 281 (6th Cir. 2019) ........................................................22, 23

*Flores v. Bennett*,
   635 F. Supp. 3d 1020 (E.D. Cal. 2022) ............................................... 34

*Gray v. Cummings*,
   917 F.3d 1 (1st Cir. 2019) .................................................................. 55

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) .......................................................................... 61

*Hazelwood Sch. Dist. v. Kuhlmeier*,
   484 U.S. 260 (1988) ............................................... 13, 41, 51, 52

*Healy v. James*,
   408 U.S. 169 (1972) ............................................................... *passim*

*Hoggard v. Rhodes*,
   141 S. Ct. 2421 (2021) ................................................................55, 56

*Iancu v. Brunetti*,
   139 S. Ct. 2294 (2019) ...................................................................... 17

*Intervarsity Christian Fellowship / USA v. Univ. of Iowa*,
   5 F.4th 855 (8th Cir. 2021) ............................................................... 56

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
   385 U.S. 589 (1967) ............................................................... 36

*Lipman v. Budish*,
   974 F.3d 726 (6th Cir. 2020) .............................................. 16

*Lowe v. S.E.C.*,
   472 U.S. 181 (1985) ............................................................. 29

*Mahanoy Area Sch. Dist. v. B.L., by and through Levy*,
   141 S. Ct. 2038 (2021) ...............................................*passim*

*Matal v. Tam*,
   582 U.S. 218 (2017) ............................................................. 19

*McCauley v. Univ. of Virgin Islands*,
   618 F.3d 232 (3d Cir. 2010) ...................................33, 34, 35

*McElhaney v. Williams*,
   81 F.4th 550 (6th Cir. 2023) ...................................18, 30, 42

*McGlone v. Cheek*,
   534 F. App'x 293 (6th Cir. 2013) ........................................ 61

*McLaughlin v. Bd. of Regents of Univ. of Okla.*,
   566 F. Supp. 3d 1204 (W.D. Okla. 2021) ............................ 39

*Miller v. City of Cincinnati*,
   622 F.3d 524 (6th Cir. 2010) .............................................. 61

*Morrow v. Meachum*,
   917 F.3d 870 (5th Cir. 2019) .............................................. 55

*Morse v. Frederick*,
   551 U.S. 393 (2007) ............................................................. 40

*Nat'l Inst. of Fam. & Advocs. v. Becerra*,
   138 S. Ct. 2361 (2018) ..........................................27, 28, 60

*New Jersey v. T.L.O.*,
469 U.S. 325 (1985) .............................................................. 35

*Nixon v. Hardin Cnty. Bd. of Educ.*,
988 F. Supp. 2d 826 (W.D. Tenn. 2013) .......................... 51, 52

*Ostergren v. Frick*,
856 F. App'x 562 (6th Cir. 2021) ........................................ 27

*Packingham v. North Carolina*,
582 U.S. 98 (2017) .......................................................... 18, 50

*Paige v. Conyer*,
614 F.3d 273 (6th Cir. 2010) .............................................. 46

*Papish v. Bd. of Curators of Univ. of Mo.*,
410 U.S. 667 (1973) ................................................... *passim*

*PETA v. Rasmussen*,
298 F.3d 1198 (10th Cir. 2002) .......................................... 58

*Powell v. McCormack*,
395 U.S. 486 (1969) ............................................................ 57

*R.S.W.W., Inc. v. City of Keego Harbor*,
397 F.3d 427 (6th Cir. 2005) .............................................. 27

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ............................................................ 28

*Reno v. ACLU*,
521 U.S. 844 (1997) ................................................... *passim*

*Rosemond v. Markham*,
135 F. Supp. 3d 574 (E.D. Ky. 2015) .................................. 29

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .............................................. 12, 19, 49

*Royal Truck & Trailer Sales & Serv., Inc. v. Kraft,*
   974 F.3d 756 (6th Cir. 2020) ............................................................ 16

*Serafine v. Branaman,*
   810 F.3d 354 (5th Cir. 2016) ........................................................... 29

*Speech First, Inc. v. Cartwright,*
   32 F.4th 1110 (11th Cir. 2022)...............................................32, 34, 36

*Speech First, Inc. v. Schlissel,*
   939 F.3d 756 (6th Cir. 2019) .......................................................44, 54

*Street v. New York,*
   394 U.S. 576 (1969) ......................................................................... 49

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.,*
   307 F.3d 243 (3d Cir. 2002)............................................................. 34

*Texas v. Johnson,*
   491 U.S. 397 (1989) ..............................................................12, 19, 60

*Thompson v. Ohio State Univ.,*
   990 F. Supp. 2d 801 (S.D. Ohio 2014).........................................44, 53

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
   393 U.S. 503 (1969) .................................................................*passim*

*U.S. v. Stevens,*
   559 U.S. 460 (2012) ......................................................................... 42

*Vereecke v. Huron Valley Sch. Dist.,*
   609 F.3d 392 (6th Cir. 2010) ........................................................... 45

*Ward v. Polite,*
   667 F.3d 727 (6th Cir. 2012) ....................................................*passim*

*Winget v. JP Morgan Chase Bank, N.A.,*
   537 F.3d 565 (6th Cir. 2008) ........................................................... 17

**Statutes**

28 U.S.C. § 1291.................................................................................1

28 U.S.C. § 1331.................................................................................1

28 U.S.C. § 1334.................................................................................1

**Rules**

Fed. R. Civ. P. 12(b)(6) ...............................................................16

Fed. R. Civ. P. 12(d) ......................................................................17

## STATEMENT REGARDING ORAL ARGUMENT

Under Federal Rule of Appellate Procedure 34(a) and Sixth Circuit Rule 34(a), Plaintiff-Appellant Diei respectfully requests that the Court schedule oral argument on her appeal. This appeal raises important questions about the fundamental First Amendment rights of hundreds of thousands of students enrolled in public professional schools. Diei believes oral argument would help the Court decide these important issues.

## JURISDICTIONAL STATEMENT

The district court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343 because Plaintiff's claims arise under the First and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction over this case under 28 U.S.C. § 1291 because the district court's August 3, 2023 order was a final order dismissing Plaintiff's lawsuit in its entirety. Plaintiff timely filed a notice of appeal on August 24, 2023. Notice of Appeal, R. 72.

## STATEMENT OF THE ISSUES

1.     The First Amendment bars public university officials from punishing students for their protected speech under the guise of professionalism policies. Defendants investigated and voted to expel Plaintiff Kimberly Diei under the College of Pharmacy's professionalism policy because of her pseudonymous posts about social and cultural issues on her personal social media accounts. Did the district court err by concluding that Defendants did not violate the First Amendment?

2.     Viewpoint discrimination is a long-settled and egregious First Amendment violation. Defendants admit they punished Diei because they disapproved of the "sexual" and "vulgar" views she expressed on her personal social media. Did the district court err by granting Defendants qualified immunity for retaliating against Diei's protected speech?

3.     Claims for retrospective declaratory relief continue to present a live controversy so long as they are tied to a claim for damages. Diei's claims for retrospective declaratory relief are tied to her damages claims because they arise out of Defendants' same course of unconstitutional conduct. Did the district court err by concluding that Diei's claims for declaratory relief are moot?

## INTRODUCTION

Plaintiff Kimberly Diei enrolled at the University of Tennessee Health Science Center College of Pharmacy in 2019. Like many Americans, Diei expressed herself on social media. She posted about issues unrelated to the College of Pharmacy, like music and sexuality. But twice, Defendants investigated Diei for posts they deemed "crude," "vulgar," and "sexual." And then, Defendants voted to expel Diei because they disliked her views, not once identifying a specific policy or provision they believed Diei's posts violated. Nearly three years after the Dean reinstated her, Diei graduated—but only after she self-censored out of fear that Defendants would expel her again.

This case is not about pharmacists or the practice of pharmacy. It is not about academics. It is not about school discipline for non-expressive misconduct. The question here is whether public school administrators can hide behind a professionalism policy to reach into the personal sphere of a professional student's social media and punish her for her protected speech, because they dislike the student's viewpoint. The First Amendment leaves no doubt: The answer is no.

## STATEMENT OF THE CASE

Diei enrolled at the University of Tennessee Health Science Center College of Pharmacy in 2019 after graduating with her bachelor's degree from the University of Chicago. *Id.*, Page ID # 6. In August 2020, Diei was a second-year doctoral student at the College. *Id.* She was in good academic standing, received excellent grades, and secured competitive pharmacy internships. *Id.* Defendants twice invaded Diei's personal life to punish her because they disliked the views she expressed online. The second time, they voted to expel her from the College of Pharmacy because of those views.

## Defendants Twice Investigate Diei Because of Her Personal, Off-Campus Social Media Speech.

Diei maintains pseudonymous social media accounts on Twitter and Instagram. *Id.*, Page ID ## 6–7. She used those personal accounts to comment on pop culture, music, and sexual expression. *Id.*, Page ID # 7. Specifically, many of Diei's posts promoted ideas that humans are inherently sexual and that it is positive and natural for people to express their sexuality through things like music and their appearance. *Id.*, Page ID ## 12–13. For example, in one tweet Diei defended the sexual lyrics of a chart-topping song after other Twitter users—who disagreed with her

open views on sexuality—argued the lyrics were inappropriate. *Id.* Her retort: "I'm bout to write a book about the birds and the bees entitled 'it started with a dick suck' Truth is that's how most of us got here." *Id.* Diei regularly posted on these accounts before she was admitted to the College of Pharmacy. *Id.*, Page ID ## 6–7.

Upon enrollment, the College of Pharmacy informed Diei and her classmates that the institution maintained a policy called "Standards for Student Professionalism Conduct," but Defendants failed to provide students, including Diei, a working link to that policy. *Id.*, Page ID ## 8–9. So Diei and her classmates remained in the dark about exactly what these standards prohibited. *Id.* Defendant Randy Boyd was responsible for this elusive policy. *Id.*, Page ID ## 4, 24. As University President, Defendant Boyd approved and implemented all policies applicable to College of Pharmacy students and is responsible for enforcing those policies. *Id.*

Just weeks into her first semester, the College of Pharmacy's Professional Conduct Committee investigated Diei because they received an anonymous complaint about her social media. *Id.*, Page ID # 8. Defendant Christa George, Chairperson of the Committee, claimed that

Diei's personal social media posts were "crude," "vulgar," and "sexual." *Id.*, Page ID ## 8–10. During the investigation, Chairperson George did not provide Diei with the policy her posts allegedly violated. *Id.* Nor did Chairperson George even identify the specific content on Diei's social media that she found objectionable. *Id.*, Page ID # 9. Diei also never saw the anonymous complaint. *Id.* To this day, she does not know why the Committee chose to invade her personal life and investigate her for her "crude" social media activity. *Id.*, Page ID ## 9–10. The Committee ordered Diei to write a reflective essay to resolve the investigation. *Id.*, Page ID # 10.

A year later, Chairperson George and the Committee once again targeted Diei and her personal, off-campus speech, also based on an anonymous "complaint." *Id.*, Page ID # 11. Chairperson George told Diei the Committee investigated her because her social media "again included material of a sexual nature, as well as crude and vulgar statements." *Id.*, Page ID ## 15–16. This time, the Committee identified examples of Diei's posts that allegedly violated school policy. *Id.*, Page ID ## 12–13.

In one tweet, Diei proposed new lyrics to the song "WAP" by Cardi B and Megan Thee Stallion. *Id.*, Page ID ## 11–12. She tweeted, "I got

that WAP he give gwap so that he can get a lick He ain't my pops but I call him DAD cuz he got that dope ass dick," and tagged the artists to say "let me be on the remix please." *Id.*, Page ID # 12. Just one week after Diei tweeted, "WAP" topped "Billboard's Hot 100" list and set a record as the most-streamed song in the country for an opening seven-day period at 93 million streams. *Id.* In another tweet, Diei defended the sexual nature of the song's lyrics because of her view that human beings are inherently sexual. *Id.*, Page ID ## 12–13. In another, Diei joked about how much time she spends getting ready to go out for the evening and posted a fully clothed provocative selfie with a reference to Beyoncé's popular song "Partition": "Spent all this time getting my hair done just for your man to fuck it up." *Id.*, Page ID # 13.

During the Committee's second investigation, Diei twice asked Chairperson George to identify the policy she allegedly violated and for a direct link to that policy. *Id.*, Page ID # 14. George stonewalled Diei's questions. Instead, she repeatedly referred to the College's "various professionalism codes." *Id.*, Page ID ## 14–15. Chairperson George again told Diei the Committee investigated her because of the "crude" and "sexual" nature of her posts. *Id.*

The Committee concluded its investigation by voting to expel Diei. *Id.*, Page ID # 16. In a letter informing Diei of the Committee's decision, Chairperson George finally referenced the College's "Technical Standards" for professionalism. Still, she did not mention a specific provision that Diei's posts allegedly violated. *Id.*, Page ID ## 15–16. The posts also did not violate Twitter or Instagram's terms of service. *Id.*, Page ID # 7.

Diei appealed the decision to College of Pharmacy Dean Marie Chisholm-Burns, who ultimately overturned Diei's expulsion. *Id.*, Page ID # 17. Yet Defendants never told Diei the standard under which the Committee expelled her or the criteria under which Dean Chisholm-Burns overturned that decision. *Id.*

Because Defendants twice investigated and ultimately voted to expel Diei because of her protected online speech, Diei self-censored for her remaining three years at the College of Pharmacy. *Id.* At least once a day, Diei declined to post on her social media accounts because she feared investigation and punishment if the Committee concluded—based on a standard unknown to Diei—that her post was "sexual," "crude," or "vulgar." *Id.* Defendants caused Diei emotional harm because Diei

reasonably feared that her future career as a pharmacist would suffer due to Chairperson George and the Committee's investigations. *Id.*

**Diei Timely Sues, Then the District Court Dismisses Her Case Two Years After Defendants Moved for Dismissal.**

In February 2021, during the second year of her four years at the College of Pharmacy, Diei sued Chairperson George, President Boyd, and the University of Tennessee Board of Trustees. Compl., R. 1. She alleged that Defendants George and Boyd unconstitutionally applied the "various professionalism codes" to expel her for her off-campus, online speech in 2020. *Id.*, Page ID ## 22–28. Diei brought her as-applied claims against George and Boyd in their individual and official capacities. *Id.*, Page ID ## 22, 25. Diei also brought a First Amendment retaliation claim against Chairperson George in her official and individual capacities. *Id.*, Page ID ## 28–29. Further, Diei alleged two facial claims that the College's "various professionalism codes" are overbroad and vague. *Id.*, Page ID ## 18–22. Her facial claims sought injunctive and declaratory relief against George, Boyd, and the University of Tennessee Board of Trustees in their official capacities. *Id.*

Defendants moved to dismiss Diei's complaint for failure to state a claim on March 1, 2021. Individual Capacity Defs.' Mot. to Dismiss, R.

24; Official Capacity Defs.' Mot. to Dismiss, R. 25. In their motion to dismiss, Defendants attached the University of Tennessee's "Standards of the Health Professions," identifying for the first time to Diei the applicable policy. *Id.*, Page ID ## 274–75. That policy applies on- and off-campus and prohibits "unprofessional and unethical conduct" which brings "disrepute" or "disgrace" to the student or profession. *Id.*, Page ID # 274. Defendants also submitted six screenshots and a video Defendants allegedly relied on to investigate Diei in 2019. Individual Capacity Defs.' Mot. to Dismiss, R. 24, Page ID # 178. Diei objected to Defendants relying on materials outside the Complaint to support their motions to dismiss. Pl. Resp. to Defs.' Mots. to Dismiss, R. 32, Page ID ## 309–11.

While those motions were pending, the parties engaged in discovery and briefing concerning at least one discovery dispute. Pl.'s Corrected Mot. for Disc., R. 60; Defs.' FERPA Objs., R. 56. At a status conference on May 26, 2022, the district court acknowledged that "the parties need the [r]ulings on the motion[s] to dismiss" and stayed discovery pending the Magistrate Judge's resolution of the parties' discovery dispute. Minutes of Proceedings, R. 53. More than nine months later, without any ruling

on the pending motions, Diei requested a status conference to discuss any additional briefing or oral argument that would assist the court in resolving the fully-briefed motions to dismiss and discovery motions in light of Diei's impending graduation. The district court did not schedule a status conference.

In May 2023, Diei graduated from the College of Pharmacy. Defendants again moved to dismiss, this time for lack of jurisdiction, arguing that Diei's graduation mooted her claims for declaratory and injunctive relief. Mot. to Dismiss, R. 64. On August 3, 2023, the district court granted Defendants' motions to dismiss for failure to state a claim and denied Plaintiff's discovery motion as moot. Order, R. 69. The district court's order relied on the materials outside the Complaint to which Plaintiff objected. *Id.*, Page ID ## 622–23. The district court also concluded that Diei's claims were moot because she had graduated. *Id.*, Page ID # 636. The next day, the district court denied Defendants' motion to dismiss for lack of jurisdiction as moot. Order, R. 70.

## SUMMARY OF ARGUMENT

The First Amendment barred Defendants from reaching into Diei's private life to punish her for protected speech on her personal social

media accounts. No student sheds her constitutional right to freedom of speech just by enrolling in a public university. Indeed, university and graduate school students retain First Amendment protection—including online, *Reno v. ACLU*, 521 U.S. 844, 868–70 (1997)—coextensive with the public at large. *Healy v. James*, 408 U.S. 169, 180 (1972). That protection includes the right to express ideas that may offend government officials without fear of punishment simply for their views. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Texas v. Johnson*, 491 U.S. 397, 414 (1989). As this Court has confirmed, professional schools are not exempt from the First Amendment's mandates. *Ward v. Polite*, 667 F.3d 727, 732–34 (6th Cir. 2012).

Defendants flouted these well-established principles by voting to expel Diei because they found her views "crude." But the First Amendment prevents public college officials from punishing a speaker based on her viewpoint, no matter if the views are "crude" or refined. And as Diei alleged, Defendants voted to expel her because they disliked her viewpoints. The district court erred by ignoring these allegations and validating Defendants' viewpoint discrimination under the pretext of a professionalism policy—a result this Court has already rejected as

unconstitutional. *Id.* at 732–34. Defendants' viewpoint discrimination alone establishes why the Court should reverse.

The speech-chilling facts here also show why the Court should reconsider its instruction that district courts should apply K–12 student speech standards to cases involving college and university students, including professional students. *Id.* at 733–34. Professional students should enjoy the full expressive freedoms of the First Amendment. *Healy*, 408 U.S. at 180. They are adults who maintain personal lives outside of school, not minor K–12 students whose educators sometimes stand in the place of their parents. This is particularly true where professional students speak off-campus, as Diei did, and where their speech is entirely unrelated to their program of study, as Diei's speech was.

Even under the standards that apply in K–12 student speech cases, Defendants' actions violated the Constitution. Diei expressed her views on social and cultural issues off-campus and on her personal social media accounts. Her off-campus, online posts did not disrupt the College of Pharmacy's operations and did not relate to pharmacy at all. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988). Yet Defendants took

Diei's expression on this personal outlet and used it to punish her because they insisted her off-campus, online speech was "vulgar," "crude," and "sexual."

Diei's allegations also show that Chairperson George retaliated against her. In fact, Chairperson George told Diei that the "sexual" and "crude" nature of her social media posts violated an unidentified professionalism policy, establishing the causation element of Diei's retaliation claim. Compl., R. 1, Page ID ## 15–16. George never explained how punishing Diei for her "sexual" views related to the College's pedagogical interest in teaching pharmacy—because it did not. *Id.* Neither Chairperson George's decision nor this case are about pharmacy or pharmacists at all—they have always been about George's dislike for Diei's views. Thus, the district court erred in overlooking Diei's allegations of viewpoint discrimination and dismissing her retaliation claim. Order, R. 69, Page ID # 635.

The district court also erred by granting Defendants George and Boyd qualified immunity for their blatant violations of the First Amendment. In August 2020, it was clearly established that professional school officials cannot hide behind professionalism policies to engage in

viewpoint discrimination. *Ward*, 667 F.3d at 734. Further, Defendants had fair notice that the First Amendment applies online, and that they could not punish students for their speech "in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). Despite this, Defendant George voted to expel Diei after engaging in a deliberative disciplinary process, citing "various professionalism codes" that Defendant Boyd was responsible for promulgating, implementing, and enforcing.

The district court also erred by concluding that Diei's claims are moot because she graduated from the College of Pharmacy in May 2023. Order, R. 69, Page ID # 636. Despite her graduation, Diei has standing to bring her facial claims challenging the constitutionality of Defendants' professionalism policy because they seek retrospective declaratory relief tied to her damages claims. And that policy is facially invalid. Defendants' "Standards of the Health Professions" policy does not provide students—who are subject to it at great personal and financial risk—any guidance about what is "disreputable" or "disgraceful." Nor does it provide administrators any guidance. Further, a nearly limitless universe of speech and expressive conduct may bring "disrepute" or

"disgrace" to the University. For that reason, the policy is overbroad. The district court erred by dismissing Diei's retrospective declaratory judgment claims as moot, and the Court should reverse and hold the policy violates the Constitution on its face.

## ARGUMENT

This Court reviews the district court's grant of a motion to dismiss de novo. *Lipman v. Budish*, 974 F.3d 726, 740 (6th Cir. 2020). A district court properly grants a motion to dismiss only where the complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Diei's complaint alleges that Defendants punished her because of the viewpoints she expressed on social media and invoked a vague, overbroad professionalism policy to do so. Compl., R. 1. As Diei argues below, these allegations support her as-applied claims, her First Amendment retaliation claim, and her claims challenging the policy itself. Further, this Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true and draw all reasonable inferences in favor of the plaintiff." *Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 758 (6th Cir. 2020).

The district improperly considered materials outside the complaint

over Diei's objection. "When reviewing a motion to dismiss, a district court may not consider matters beyond the complaint." *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008). "If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Plaintiff continues to object to Defendants' improper attempt to rely on material outside the Complaint. Even if the Court considers Defendants' "Standards of the Health Professions" incorporated as to Plaintiff's facial claims, the policy is unconstitutional.

Because the district court failed to draw all reasonable inferences in Diei's favor and discounted her direct allegations of viewpoint discrimination, this Court must reverse.

## I.    Defendants Violated the First Amendment By Punishing Diei for Views She Expressed on Her Personal Social Media.

Viewpoint discrimination is "poison to a free society." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (Alito, J., concurring). That is why the First Amendment does not tolerate it on campus or online. The district court erred by misapplying well-established Supreme Court and Sixth Circuit precedent protecting student speech rights and prohibiting

public professional schools from engaging in viewpoint discrimination. The district court also erred by validating Defendants' viewpoint discrimination and by concluding that Diei voluntarily gave up her expressive rights simply by enrolling at the College of Pharmacy.

### A. The First Amendment protects professional students' social media speech against viewpoint discrimination.

The First Amendment "muscularly protects most types of speech." *McElhaney v. Williams*, 81 F.4th 550, 557, 559 (6th Cir. 2023). That includes social media and other online speech. *Reno*, 521 U.S. at 868–70; *Packingham v. North Carolina*, 582 U.S. 98, 107–08 (2017). These constitutional protections for online speech extend to students at all levels. Like many Americans, student speakers like Diei often express themselves online. When students speak off-campus through their online platforms, "courts must be more skeptical of a school's efforts to regulate [their] speech, for doing so may mean the student cannot engage in that kind of speech at all." *Mahanoy Area Sch. Dist. v. B.L., by and through Levy*, 141 S. Ct. 2038, 2046 (2021).

Whether online or offline, the First Amendment's protection is near its zenith where the government targets a speaker based on their viewpoint. "[T]he government may not prohibit the expression of an idea

simply because society finds the idea itself offensive or disagreeable." *Johnson*, 491 U.S. at 414. The Supreme Court has repeatedly held that "[g]iving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017).

The prohibition against viewpoint discrimination—an "egregious form of content discrimination"—applies with particular force at public universities. *Rosenberger*, 515 U.S. at 829, 836 (explaining how viewpoint discrimination on campus "risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life"). Similarly, public university officials cannot silence students "in the name alone of 'conventions of decency.'" *Papish*, 410 U.S. at 670. These protections bind public professional schools like the College of Pharmacy. In evaluating graduate student's First Amendment claims, this Court noted the Supreme Court's "insist[ence] that public schools are not expression-free enclaves." *Ward*, 667 F.3d at 732–34. *See also DeJong v. Pembrook*, No. 3:22-cv-01124-NJR, 2023 WL 2572617, at *9–10 (S.D. Ill. Mar. 20, 2023) ("[Graduate student plaintiff] clearly has the right . . . to express her religious, political, and social views on her personal social media account . . . without fear of retaliation from school officials.").

In sum, public schools do not have carte blanche to invade a

student's private life to investigate and punish speech they dislike.

### B. Defendants unconstitutionally punished Diei for her viewpoints under the guise of "various professionalism codes."

A decade ago, this Court affirmed that professional school administrators must enforce their codes of conduct and professionalism in a viewpoint-neutral manner. *Ward*, 667 F.3d at 734. Because professional students retain full First Amendment rights, public professional schools like the College of Pharmacy cannot "invoke curriculum 'as a pretext for punishing'" a student because they dislike her views. *Id.* Doing so is classic viewpoint discrimination.

*Ward* controls Diei's claims. Diei's allegations show that Chairperson George and the Committee discriminated against her because of the views she expressed on social media. And they did so under the guise of the "various professionalism codes" President Boyd is responsible for promulgating, implementing, and enforcing.

#### 1. Professional school administrators cannot invoke professionalism policies as pretext to punish students for their viewpoints.

In *Ward*, the plaintiff was a counseling graduate student who challenged her school's decision to expel her for allegedly violating school policy. *Id.* at 730–31. The student referred a gay client in her practicum

course to another counselor because affirming the client's sexual orientation would violate her religious beliefs. *Id.* at 735. Administrators determined that this violated the American Counseling Association's code of ethics, which the school incorporated into the student handbook. *Id.* at 731. This Court reversed the district court's grant of summary judgment for the defendants because a jury could have found that the school "ejected her . . . because of hostility towards her speech . . . ," not a policy violation. *Id.* at 730. Nothing in the code of ethics prohibited making referrals—administrators merely used an alleged policy violation as a pretext to punish Ward for her religious views and speech.

While professional schools can punish unprofessional *conduct*, they cannot lean on their policies to punish *speech* on social media as an "academic judgment." Thus, the district court erred in relying on this Court's decision in *Al-Dabagh v. Case W. Rsrv. Univ*, because it involved conduct, not speech. 777 F.3d 355 (6th Cir. 2015). In that case, a private medical school expelled a student whose conduct, including criminal charges for driving under the influence, violated the school's professionalism policies. *Al-Dabagh*, 777 F.3d at 357–58. This Court deferred to the school's judgment because the decision was an "academic

judgment" and was entitled to deference under Ohio and federal due process law. *Id.* at 359. Also, because the student was at a private university, the Constitution's protections for free speech did not limit the administrators. *Id.* (evaluating plaintiff's claims in light of his "contractual" relationship with the university).

But since *Al-Dabagh*, this Court has clarified that professional schools cannot convert everything into an "academic judgment." *Enders v. Ne. Ohio Medical Univ.*, 938 F.3d 281, 299 (6th Cir. 2019). In *Enders,* a public medical school student sued his university for due process violations after it expelled him for cheating on an exam. *Id.* at 291–92. This Court observed that "it cannot be the case that because [a student's] alleged misconduct somehow relates to a professional trait, the medical school need only treat the matter as academic and provide the student with minimal process." *Id.* at 299. If that were the rule, it would encourage schools to treat *all* disciplinary allegations—including those involving student speech—as relating to a "professional" trait and therefore punishable. *Id.*

Like the plaintiff in *Enders* who argued that his dismissal for cheating was not an "academic" determination, Diei has alleged that

Defendants punished her for her viewpoints, not by proper application of any academic or "professionalism" rule. Although Diei has not alleged a procedural due process claim, the Court's concern in *Enders* that professional schools will attempt to avoid well-established constitutional constraints by invoking their pedagogical mission is no less of a concern in the First Amendment context.

Above all, public professional schools cannot invoke "academic judgment" to punish protected speech. That is especially true when they target private or personal speech unrelated to any pedagogical mission, just like Diei's personal social media speech here. In short, the First Amendment's prohibition on viewpoint discrimination controls Diei's claims.

> **2.    Defendants unconstitutionally invoked the College of Pharmacy's "various professionalism codes" to punish Diei for her viewpoints.**

The district court disregarded *Ward*'s controlling authority. The administrators in *Ward* invoked the school's code of ethics when they expelled a student because of her religious viewpoints, which did not support same-sex relationships. Like those administrators, Chairperson George and the Committee also invoked a professionalism policy to

punish Diei because of her viewpoints on sexuality and human nature, and even her music taste. And just like in *Ward*, where the code of ethics was silent about referring patients because of religious objections, there is nothing in Defendants' "Standards of the Health Professions" policy— which they identified as the applicable policy only in response to Diei's lawsuit—that prohibits students from posting views about pop culture, music, and sexuality online.

The district court also erred by concluding that "[t]here is no indication in the record that any of the university officials used [Diei's] posts as a means to retaliate against her." Order, R. 69, Page ID # 635. Diei's allegations show otherwise. In fact, they show blatant viewpoint discrimination, and the district court erred by not taking those allegations as true at this stage.

Diei alleges that Chairperson George and the Committee punished her for expressing viewpoints that they considered unacceptable because they were "sexual," "crude," and "vulgar." *Id.*, Page ID ## 15–16. George admitted as much. During the 2019 investigation, Chairperson George told Diei that the "sexual," "crude," and "vulgar" viewpoints on Diei's social media violated the College of Pharmacy's "various professionalism

codes." *Id.*, Page ID # 9. And in 2020, Chairperson George told Diei her social media "posts again included material of a 'sexual' nature, as well as 'crude' and 'vulgar' statements." *Id.*, Page ID ## 15–16. Those posts expressed Diei's views that humans are inherently sexual and may express that sexuality, including through music—as an example, the sexually forward lyrics of a chart-topping song. *Id.*, Page ID ## 11–12.

Chairperson George justified this blatant viewpoint discrimination under the guise of a professionalism policy—one that President Boyd approved, implemented, and had responsibility to enforce. *Id.*, Page ID # 24. Yet George never provided that policy to Diei. *Id.*, Page ID ## 14–15. Even more telling, Chairperson George could not point to a particular provision she believed Diei violated, even as Diei repeatedly asked her to. *Id.*, Page ID ## 8, 14. Instead, George simply invoked the "various professionalism codes" as cover for her dislike of Diei's views.

Chairperson George's refusal to specify any provision in the policy revealed a pretextual motive to use the policy as a vehicle to punish Diei for her viewpoints. So too does George's inability to explain how the allegedly "sexual," "crude," or "vulgar" nature of Diei's posts violated the unidentified policy, let alone for social media posts that were entirely off-

campus, non-disruptive, and unrelated to Defendants' mission of educating pharmacists. *Id.*, Page ID ## 14–15. In fact, Diei's posts were not about pharmacy at all. Rather, those posts expressed Diei's open views about sexuality and her music taste. And they were pseudonymous, so those who saw them on social media would be hard-pressed to connect them to Kimberly Diei, student at the College of Pharmacy.

Just as it did in *Ward*, this Court should reject Defendants' attempt to cloak their impermissible viewpoint discrimination behind a professionalism policy. *Id.*, Page ID ## 16–17. The First Amendment does not permit Defendants reach off-campus into an adult student's personal life to punish speech they dislike. *Ward*, 667 F.3d at 734. And, as explained below, Diei did not waive her rights simply by attending a public professional school.

## C. Public professional schools cannot condition enrollment on a waiver of First Amendment rights.

Every day, thousands of students enroll in public professional schools nationwide. Virtually all those schools enforce codes of conduct and ethics. But these thousands of students do not give up their fundamental First Amendment protections simply by enrolling. The district court erred by concluding that Diei signed away her expressive

rights. Order, R. 69, Page ID # 641. A state actor cannot condition a benefit on a recipient's waiver of constitutional rights. *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005) ("Under the unconstitutional conditions doctrine, 'a state actor cannot constitutionally condition the receipt of a benefit . . . on an agreement to refrain from exercising one's constitutional rights.'") (citation omitted); *see also Ostergren v. Frick*, 856 F. App'x 562, 571 (6th Cir. 2021) ("[T]he government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected interests.'").

Like other professionals, Diei did not give up her right to free expression by enrolling at the College of Pharmacy. Professional speech is not a separate, unprotected category of speech "merely because it is uttered by professionals." *Nat'l Inst. of Fam. & Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) (internal quotations omitted). The district court erred by concluding that "even if [Diei's social media posts] were protected, she voluntarily agreed to abide by the University policies regarding student conduct." Order, R. 69, Page ID # 641. According to the court, "[b]y signing this document ['Standards for Student Professional Conduct'], Diei affirmed her knowledge of, and commitment to abide by

27

UTHSC policies" on- and off-campus. *Id.*, Page ID ## 625, 630. This conclusion ignores the power dynamic between students and professional schools and goes against Supreme Court precedent on professional speech like *Becerra*.

Nor can the government impose "content-based restrictions" on professional speech without violating the First Amendment. *Becerra*, 138 S. Ct. at 2372. This principle protects professional pharmacists in Tennessee, who Defendants contend are governed by the same professionalism policy the College of Pharmacy enforces,[1] from content-based censorship. A rule banning "sexual," "vulgar," or "crude" speech is necessarily content-based. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("Content-based laws . . . target speech based on its communicative content . . . ."); *Reno*, 521 U.S. at 868 (concluding that a restriction on "indecent" and "patently offensive" speech was a content-based restriction).

Professional schools like the College of Pharmacy cannot constitutionally enforce a professionalism policy that would be

---

[1] Official Capacity Defs.' Mot. to Dismiss, R. 25-1, Page ID ## 274–75.

unconstitutional as applied to a working pharmacist who made "crude" posts on social media. The professional speech doctrine, which allows the government "to regulate speech in limited circumstances so as to protect the individual receiving advice—the client," does not apply here. *Rosemond v. Markham*, 135 F. Supp. 3d 574, 584 (E.D. Ky. 2015) (relying on *Lowe v. S.E.C.*, 472 U.S. 181, 232 (1985) (White, J., concurring)). And it makes no difference that this case involves speech online. *See Serafine v. Branaman*, 810 F.3d 354, 360–62 (5th Cir. 2016) (holding that a political candidate's statements on her website were "entitled to full First Amendment protection" because she was not providing psychological advice and communicated with the public at large, not a client). Like in *Rosemond* and *Serafine*, in this case the "'personal nexus between professional and client' does not exist." *Rosemond*, 135 F. Supp. 3d at 584. Diei spoke online, to the public, under a pseudonym, and on topics entirely unrelated to pharmacy. If Diei were a pharmacist in 2020 instead of a student, her speech would have fallen squarely outside the state pharmacy board's constitutional zone of regulation.

In the end, Defendants cannot avoid the First Amendment's prohibition on viewpoint discrimination. That alone is why the Court

29

should reverse on Diei's third, fourth, and fifth claims, which allege as-applied free speech violations against Defendants Boyd and George and First Amendment retaliation against Defendant George. *See infra* Section III.C.

## II. Defendants' Decision to Expel Diei Was Unconstitutional Under Any Standard.

Chairperson George and President Boyd violated the Constitution because Diei's social media posts were squarely within the realm of speech the First Amendment "muscularly protects." *McElhaney*, 81 F.4th at 559. Adult professional students, like all college and university students, retain their expressive rights coextensive with "the community at large." *Healy*, 408 U.S. at 180. The same standard that protects all Americans—the First Amendment—is the standard this Court should apply to Diei's claims. This is so because she is an adult who expressed herself off-campus, on social media, on her own time, not—for example—a minor who gave a "lewd" speech on a high school campus. Even applying K–12 student speech precedents, Diei's posts remain protected because they were non-disruptive and were entirely unrelated to pharmacy.

A.  **Adult professional students retain full First Amendment rights because the "special characteristics" of the K–12 environment are absent in higher education.**

Public schools have leeway to regulate some on-campus student speech where they stand *in loco parentis*, or in the place of parents. *Mahanoy*, 141 S. Ct. at 2044–45. Even though university students are mostly adults, this Court instructs district courts to apply K–12 student speech standards to cases that arise on university campuses. *Ward*, 667 F.3d at 733–34. But the facts of this case provide an opportunity for the Court to reconsider that portion of its holding in *Ward*. And it should for two reasons: first, because Supreme Court precedent mandates that the First Amendment applies to university students in the same way it applies to society at large; and second, because university students are adults—any interest their institutions have in regulating student speech is a far cry from the interest of K–12 schools, especially off-campus.

Fifty years ago, the Supreme Court held that its "precedents . . . leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. 180. The precedent the Supreme Court was referring to

was *Tinker*. *Id.* (discussing *Tinker*'s holding earlier in the same paragraph). This pronouncement demonstrates that the "special characteristics" of the K–12 school environment the Court discussed three years earlier in *Tinker*, 393 U.S. at 506, do not restrict the expressive rights of adult college and university students like Diei. Instead, the full force of the First Amendment protects their speech.

For example, in *Mahanoy*, a K–12 case, the Supreme Court began its analysis by considering the context in which B.L. spoke—online, and off-campus. *Mahanoy*, 141 S. Ct. at 2045–46. And "[p]utting aside the vulgar language," B.L.'s speech expressed "criticism of the rules of a community." *Id.* at 2046. The Court proceeded to conclude that B.L.'s speech was not fighting words or obscene—to the contrary, it was "the kind of pure speech to which, were she an adult, the First Amendment would provide strong protection." *Id.* Unlike B.L., Diei *is* an adult who engaged in speech the First Amendment protects off-campus. *Tinker* and its progeny, therefore, should not give Chairperson George and the Committee an out to punish her or other adult university students who speak off-campus. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110,

1127 n.6 (11th Cir. 2022) (questioning *Tinker*'s relevance to off-campus university student speech in light of *Mahanoy*).

Further, the distinction between adult university student speech and K–12 student speech is well-founded, both as a general matter and on the facts of this case. Sister courts have recognized that college and university administrators have less leeway to regulate student speech than that which K–12 administrators wield:

> in light of the differing pedagogical goals of [K–12 schools and universities] [2], the *in loco parentis* role of [K–12] administrators, the special needs of school discipline in [K–12] schools, the maturity of students, and . . . the fact that many university students reside on campus and are thus subject to university rules at almost all times.

*McCauley v. Univ. of Virgin Islands*, 618 F.3d 232, 242–43 (3d Cir. 2010).

*See also Bd. of Regents of Univ. of Wisc. Sys. v. Southworth*, 529 U.S. 217,

---

[2] Because Diei spoke outside class, off-campus, and online, this factor is less important in this case. But, notably, in *Ward* the plaintiff spoke in the context of a curricular activity and *still* this Court held that her professional school administrators had to abide by the First Amendment's prohibition on viewpoint discrimination. *Ward*, 667 F.3d at 734. And in other college and university student speech cases, it may be critical that the "university atmosphere of speculation, experiment, and creation is essential to the quality of higher education," whereas K–12 schools are also responsible for "the inculcation of societal values." *McCauley*, 618 F.3d at 243.

238 n.4 (2000) (Souter, J., concurring) (explaining that elementary school "students and their schools' relation to them are different and at least arguably distinguishable from their counterparts in college education"); *DeJohn v. Temple Univ.*, 537 F.3d 301, 315 (3d Cir. 2008) ("[T]here is a difference between the extent that a school may regulate student speech in a public university setting as opposed to that of" a K–12 school.); *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 260 (3d Cir. 2002) (same); *Cartwright*, 32 F. 4th at 1127 n.6 (same); *Flores v. Bennett*, 635 F. Supp. 3d 1020, 1034 (E.D. Cal. 2022) (noting differences between K–12 schools and colleges and universities).

Administrators at colleges and universities do not stand *in loco parentis* in part because their students are adults. "The idea that public universities exercise strict control over students via an *in loco parentis* relationship has decayed to the point of irrelevance." *McCauley*, 618 F.3d at 245 (citations omitted). As Justice Alito noted in his concurrence in *Mahanoy*, "[f]or several reasons, including . . . age, independence, and living arrangements," regulation of public college or university student speech raises "different questions" than K–12 student speech. 141 S. Ct. at 2049 n.2 (Alito, J., concurring). Here, Diei was an adult who posted

34

her views on her personal social media accounts. For these reasons, Chairperson George and the Committee did not stand *in loco parentis* and K–12 standards should not apply to their decision to punish her because of the views she expressed online.

Further, the special needs of K–12 school discipline—which call for "enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult"—are not applicable in college. *McCauley*, 618 F.3d at 245 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 339 (1985)). "[P]ublic university students are given opportunities to acquit themselves as adults. Those same opportunities are not afforded to public elementary and high school students." *Id.* at 246. Perhaps some employers, for example, would balk at Diei's social media posts if they were to associate her with her pseudonym.[3] But the First Amendment allows Diei to make that decision and bear the consequences, if they come; it is outside her public university administrators' constitutional purview to make that decision for her.

---

[3] They did not, and Diei secured competitive pharmacy internships during her time at the College of Pharmacy. Compl., R. 1, Page ID # 6.

Finally, public elementary and high school administrators must also "take into account the emotional maturity of the intended audience." *Id.* "Considerations of maturity are not nearly as important for university students, most of whom are already over the age of 18 and entrusted with a panoply of rights and responsibilities as legal adults." *Id.* Diei was an adult, and her intended audience was the public at large, on a social media platform. This factor, too, counsels that the standards that apply to K–12 student speech should not apply to Diei and other adult university students, especially when they speak off-campus.

Recently, the Eleventh Circuit similarly dismissed the argument that the "more deferential standard articulated in *Tinker*" applies to public universities, particularly where they seek to regulate off-campus expression. *Cartwright*, 32 F.4th at 1127 n.6. The Eleventh Circuit focused on three reasons in rejecting that argument. First, because precedent far from mandates it. *Id.* (citing *Papish*, 410 U.S. at 669–70, *Healy*, 408 U.S. at 180, and *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967)). Second, because in *Mahanoy* the Supreme Court expressed skepticism that those rules apply to off-campus

speech even in the high school setting. *Id.* And third, because *Tinker*'s deferential standard does not apply to viewpoint-based restrictions. *Id.*

While the court in *Cartwright* was evaluating a discriminatory harassment policy that was viewpoint-based on its face, here too, Diei is alleging viewpoint discrimination. *Tinker*'s deferential standard, therefore, should not apply, a conclusion that *Ward*'s reasoning supports. *See supra* Section I.B.

For these reasons, the Court should reconsider its holding in *Ward* that K–12 standards apply to adult college and university student speech. Those standards are simply inapt considering the age and maturity of university students and the purpose of higher education.

### B.    Diei's off-campus speech was not disruptive or related to Defendants' legitimate pedagogical interests.

Even if the Court adheres to its previous holding that K–12 student speech standards apply to cases involving college and university student speech, Defendants still violated the Constitution. Applying *Tinker* and its progeny, as *Ward* instructs, Diei's off-campus, personal speech on social media was protected. The baseline assumption is that students retain their First Amendment rights. *Tinker*, 393 U.S. at 506. In certain circumstances, this baseline accommodates schools' interests in

prohibiting speech that substantially and materially interferes with schoolwork or discipline; prohibiting vulgar, lewd, indecent, or plainly offensive student speech *on-campus*; and controlling school-sponsored speech consistent with their pedagogical missions. *See Barr v. Lafon*, 538 F.3d 554, 563–64 (6th Cir. 2008). Diei's social media posts implicate none of these interests.

Diei's personal social media posts are not in-school or school-sponsored speech. She posted them off-campus and they did not mention the College of Pharmacy. Chairperson George and the Committee did not argue that the posts were disruptive at all, let alone disruptive enough to meet the standard in *Tinker*. 393 U.S. at 513.

*Mahanoy* underscores why the Committee could not punish Diei's off-campus social media speech. There, a frustrated high school student, B.L., complained about her school and coaches by saying "fuck school fuck softball fuck cheer fuck everything" on Snapchat, a social media platform. *Mahanoy*, 141 S. Ct. at 2043. The school suspended her from the junior varsity cheer squad for the upcoming year because of her post. *Id.* Administrators argued that the post was disruptive because a teacher

and students discussed the matter for a few minutes during an Algebra class. *Id.* at 2047–48.

In deciding her suspension violated the First Amendment, the Supreme Court held that schools have "diminished" authority to punish off-campus speech. *Id.* at 2046. Because B.L. "spoke outside the school on her own time" and her post had a negligible impact at school, her speech was protected. *Id.* at 2047–48. The minimal disturbance during an Algebra class did not satisfy *Tinker*'s "demanding standard" for a substantial disruption. *Id.* at 2048.

Applying *Mahanoy*, a sister circuit has held that even where multiple parents brought a student's anti-Semitic social media posts to the principal's attention, there was no "substantial disruption." *C1.G ex rel. C.G. v. Siegfried*, 38 F.4th 1270, 1278–79 (10th Cir. 2022). *See also McLaughlin v. Bd. of Regents of Univ. of Okla.*, 566 F. Supp. 3d 1204, 1213 (W.D. Okla. 2021) ("If a student's posting, via social media, of a direct and vulgar attack on her school and its coaches is protected speech . . . it is difficult to see how posting a somewhat ambiguous emoji" about whether the Eyes of Texas is a racist song "could be otherwise."). Chairperson George took issue with Diei's posts because they were

"vulgar"—so was B.L.'s profane Snapchat post. But it "did not involve features that would place it outside the First Amendment's ordinary protection." *Mahanoy*, 141 S. Ct. at 2046. Neither did Diei's—Defendants have, rightly, never argued that her posts were obscene. Diei, like B.L., engaged in pure speech protected by the First Amendment, and Defendants have not satisfied the "demanding standard" necessary to police her off-campus expression.

Much like Chairperson George, the defendants in *Bethel School District No. 403 v. Fraser*, argued that they could punish a student because his speech was "lewd" and "indecent." 478 U.S. 675, 677–78 (1986). But the student's speech in *Fraser* occurred *on-campus* during a *high school* student assembly. And in another high school student speech case, the Supreme Court explained that if Fraser had delivered his "lewd" speech outside school, "it would have been protected." *Morse v. Frederick*, 551 U.S. 393, 405 (2007). The Supreme Court reiterated this point in *Mahanoy*. The Court explained that although B.L.'s Snapchat posts were "crude, [they] did not amount to fighting words," and while the posts "used vulgarity, her speech was not obscene as this Court has understood that term." *Mahanoy*, 141 S. Ct. at 2046 (citations omitted). For these

reasons and because she posted off-campus, outside school hours the school had a "diminish[ed] . . . . interest" in punishing B.L. for her speech. *Id.* at 2047. Those same characteristics are true as to Diei's posts. Compl., R. 1, Page ID ## 6–8. The district court erred by concluding that Chairperson George and the Committee could punish her for them.

Further, "the less the speech has to do with the curriculum and school-sponsored activities, the less likely any suppression will further a 'legitimate pedagogical concern.'" *Ward*, 667 F.3d at 734 (citing *Hazelwood*, 484 U.S. at 271). The plaintiff's expressive conduct in *Ward* occurred during her participation in a counseling practicum, which was part of her program curriculum. *Id.* at 730. This Court still maintained that her administrators could not invoke their professionalism policy to punish her for her religious viewpoints. *Id.* at 738.

The district court erred in concluding that Diei's social media posts were unprotected. That was an error, even under the Supreme Court's standards for K–12 schools.

## III.  Defendant George Unlawfully Retaliated Against Diei Because She Believed Diei's Protected Speech Was "Vulgar."

Chairperson George led the Committee to unanimously vote to

expel Diei for her views on culture and sexuality. And she told Diei as much, explaining the Committee punished her because her posts were "vulgar," "crude," and "sexual." Compl., R. 1, Page ID ## 15–16. With that in mind, any professional student who already dedicated substantial time and resources to achieving an advanced degree would self-censor rather than risk losing out on that degree.

For these reasons, Diei sufficiently alleged her claim for First Amendment retaliation. Diei has alleged that "'(1) [she] engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against [her] that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) . . . the adverse action was motivated at least in part by [her] protected conduct.'" *Anders v. Cuevas*, 984 F.3d 1166, 1175 (6th Cir. 2021).

### A.    The First Amendment protects social media speech, even if a public official finds it "vulgar."

Speech is protected unless it falls into one of the "historic and traditional categories" of unprotected speech. *U.S. v. Stevens*, 559 U.S. 460 (2012); *Counterman v. Colorado*, 600 U.S. 66, 73–74 (2023). Diei's posts do not fall into any of these well-established categories—and Defendants never contended that they do. Therefore, they are

presumptively protected under the First Amendment. *McElhaney*, 81 F.4th at 557. It does not matter that Diei used profanity, *Mahanoy*, 141 S. Ct. at 2043, 2048, or that her posts included allusions to sex. They did not even violate Twitter or Instagram's terms of service—terms that are more restrictive than the First Amendment's standards. Compl., R. 1, Page ID # 7. And as discussed above, they do not lose their constitutional protection merely because Diei was enrolled at the College of Pharmacy. *See supra* Sections I.B. and I.C.

The Supreme Court's holding in *Papish* resolves any doubt about this issue. There, campus officials sanctioned a student after she published a newspaper featuring on its cover a vulgar and "indecent" cartoon—"depicting policemen raping the Statue of Liberty and the Goddess of Justice." *Papish*, 410 U.S. at 667. Rejecting the dissent's admonishment about "lewd" speech on campus, the Supreme Court announced that expression "on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Id*. at 670. Like the cartoon in *Papish*, the First Amendment protects Diei's social media posts even if Chairperson George found them "vulgar."

Unlike the cartoon in *Papish*, Diei posted online, off-campus, on her

43

own time and her personal social media accounts. If "lewd" expression is protected on-campus, it is protected off-campus. And this is equally true of speech in cyberspace. *Reno*, 521 U.S. at 845 (holding that there is "no basis for qualifying the level of First Amendment scrutiny that should be applied" to the internet). Because Diei's speech was protected, she met the first prong of a retaliation claim.

## B.   The specter of expulsion would deter a student of ordinary firmness from speaking.

Administrators who discipline a student in retaliation for their protected speech deter an ordinary student from continuing to speak. Even the initiation of an investigation is enough. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) (finding the "implicit threat of consequences" from a university "bias response team" chilling); *Thompson v. Ohio State Univ.*, 990 F. Supp. 2d 801, 809 (S.D. Ohio 2014) (finding that even filing a charge that initiates an investigation can support the adverse action prong of First Amendment retaliation).

Chairperson George and the Committee investigated Diei's speech on social media twice. Compl., R. 1, Page ID ## 8, 11. And the Committee did much more than initiate an investigation. They unanimously voted to expel Diei because of her speech. *Id.*, Page ID # 16. She spent nearly

three weeks thinking that she would be expelled, almost certainly ending her path towards a pharmacy career. *Id.*, Page ID # 17. And Chairperson George and Committee's decision chilled Diei's expression for the rest of her time as a student at the College of Pharmacy. *Id.* Until her graduation in May 2023, Diei feared the Committee would again investigate and expel her because of her speech on social media. *Id.*, Page ID ## 17–18.

The district court erred by ruling that Diei did not sufficiently allege this element at the motion to dismiss stage, Order, R. 69, Page ID ## 631–32, especially because the chilling element is a question of fact. *Bell v. Johnson*, 308 F.3d 594, 603–04 (6th Cir. 2002) (reversing because there was a question of fact as to whether defendants' acts would deter a person of ordinary firmness from engaging in protected activity).

### C. Chairperson George admitted that the Committee punished Diei because of her expression on social media.

"To establish causation, [Diei] must demonstrate that [her] protected speech was 'a substantial or motivating factor' of the adverse action." *Anders*, 984 F.3d at 1177 (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010)). Diei met this element. She

alleged that Chairperson George specifically identified her protected speech as the reason for the Committee's 2020 investigation. Compl., R. 1, Page ID ## 14–15. Further, Chairperson George stonewalled Diei's questions about what policy or provision her posts violated. *Id.*, Page ID # 14. Chairperson George could not explain why Diei's posts allegedly violated the policy because they in fact merely violated Chairperson George's own "'conventions of decency.'" *Papish*, 410 U.S. at 670.

Further, Diei alleged Chairperson George also identified her protected speech as the reason for the Committee's 2019 investigation. Compl., R. 1, Page ID ## 8–10. While Diei's claims do not rely on the 2019 investigation, her allegations show a pattern of Chairperson George and the Committee's hostility towards her speech. And the district court erred by blindly accepting George's proposition that she was enforcing a neutral College policy. Diei's well-pled allegations show that George was in fact punishing Diei because of the viewpoints she expressed. *Id.*, Page ID ## 8–10, 15–16.

Causation is a question of fact for a jury, *Paige v. Conyer*, 614 F.3d 273, 282 (6th Cir. 2010), and Diei's well-pleaded allegations establish this prong of her retaliation claim. The district court erred in not taking these

well-pled allegations as true, as it must in ruling on a motion to dismiss. The Court should reverse the dismissal of Diei's retaliation claim.

## IV. Defendants George and Boyd Are Not Entitled to Qualified Immunity for Punishing Diei Because of Her Viewpoints.

Qualified immunity does not protect Defendants because they engaged in blatant viewpoint discrimination to punish Diei's speech. Diei spoke off-campus, her posts were non-disruptive, and were entirely unrelated to the College of Pharmacy's pedagogical mission. Chairperson George voted to expel Diei under President Boyd's "various professionalism codes" anyway[4]—a decision qualified immunity does not protect, because it is clearly established that even the initiation of a disciplinary investigation chills speech. That Defendants had months to consider Diei's expressive rights, and chose to violate them anyway, highlights why qualified immunity does not shield them. The district court erred by holding otherwise, and the Court should reverse.

---

[4] Diei alleges claims for as-applied viewpoint discrimination against Defendants George and Boyd in their individual and official capacities. Compl., R. 1, Page ID ## 22, 25. She alleges First Amendment retaliation against Defendant George only. *Id.*, Page ID ## 28–29.

### A.    Fair notice is the touchstone of qualified immunity.

"To defeat a claim of qualified immunity, the plaintiff must show that the official's conduct (1) violated a constitutional right that (2) was clearly established." *Anders,* 984 F.3d at 1175. A right is clearly established when officials have "fair warning" that their conduct violates established law. *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019) (citation omitted).[5] Demonstrating that the law was clearly established does "not require a case directly on point[.]" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Sixth Circuit has advised that "an official can be on notice that his conduct violates established law even in novel factual situations." *Cahoo,* 912 F.3d at 898 (citation omitted). "'[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs.'" *Id*. (citation omitted).

---

[5] In evaluating whether a right is clearly established, courts in this circuit "must look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within our circuit, and finally to decisions of other circuits." *Cahoo*, 912 F.3d at 898.

**B.     Defendants violated clearly established law by punishing Diei because of her message.**

The district court erred by concluding that because "Diei's rights were not clearly established," the "Defendants would not reasonably know that their actions violated a constitutionally protected right." Order, R. 69, Page ID # 635. It is well settled in the Sixth Circuit that professional school administrators may not engage in viewpoint discrimination. In *Ward*, this Court correctly held that school administrators may not "invoke curriculum as a pretext for punishing" a student because of her viewpoint. 667 F.3d at 734 (citation omitted). Moreover, for decades, "[i]t [has been] firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York,* 394 U.S. 576, 592 (1969); *see also Rosenberger*, 515 U.S. at 835–36 (explaining that viewpoint discrimination is equally if not more dangerous on a college campus).

Diei unambiguously alleged that Chairperson George voted to expel her because of the viewpoints she expressed on social media and invoked the College of Pharmacy's professionalism policy—which President Boyd is responsible for—as pretext to do so. Compl., R. 1, Page ID ## 14–15.

49

Chairperson George charted this course even though Diei's speech had nothing to do with pharmacy and she performed well academically. *Id.*, Page ID ## 6, 11–13. And Defendants knew better than to maintain a vague policy and invoke it to punish speech because, for years, the law in this Circuit has prohibited precisely this kind of viewpoint discrimination. *Ward*, 667 F.3d at 734.

It was also clearly established before Diei enrolled at the College of Pharmacy that the First Amendment protects speech online just as forcefully as it protects speech offline. *Reno*, 521 U.S. at 868–70; *Packingham*, 582 U.S. at 107–08. Even earlier, the Supreme Court gave Defendants fair notice in *Papish* that they could not punish Diei because her social media posts were allegedly "vulgar." *Papish*, 410 U.S. at 670. There, administrators invoked a provision prohibiting "indecent conduct or speech" to punish a graduate student for distributing an "indecent" cartoon. *Id.* at 668. And the student intentionally distributed her cartoon on campus in an area where students, guests, and parents, including minors, passed through. *Id.* at 675–76 (Burger, C.J., dissenting). Still, the Supreme Court held that the First Amendment protected her speech because "the state University's action here cannot be justified as a

50

nondiscriminatory application of reasonable rules governing conduct." *Id.* at 671. Given these decisions, Defendants and the district court had fair warning that the First Amendment prohibited them from punishing Diei for her social media posts, no matter if they found her posts "vulgar."

The district court concluded that Defendants punished Diei because her "posts on social media were inappropriate only because of the College of Pharmacy's effort to maintain the high ethical and professional standards of the profession." Order, R. 69, Page ID # 635. That was error, as *Ward* made clear years before the Defendants' unconstitutional acts. Indeed, *Ward* gave Defendants fair notice that they could not punish Diei for her protected speech on social media because it conveyed a message they disliked. *Ward*, 667 F.3d at 734–35. In the same way, the Supreme Court made clear in *Papish* that college administrators cannot cloak viewpoint discrimination by relying on general "decency" policies. *Papish*, 410 U.S. at 670–71.

In addition, the reasoning of cases holding that the First Amendment protects *K-12 student* social media speech cements why it was clearly established that Defendants could not punish Diei for her social media posts. For example, the district court's decision in *Nixon v.*

*Hardin Cnty. Bd. of Educ.* demonstrates how the longstanding *Tinker*, *Fraser*, and *Hazelwood* line of cases applies to a student social media case. 988 F. Supp. 2d 826 (W.D. Tenn. 2013). There, the court held that school administrators may not punish speech on social media unless it implicates the school's interests, as explained in *Tinker*, *Fraser*, and *Hazelwood*. *Id.* at 839. Or take the Third Circuit's conclusion in 2020 that school administrators violated a student's expressive rights by punishing her for her off-campus social media posts. *B.L. v. Mahanoy Area Sch. Dist.*, 964 F.3d 170, 177–78 (3d Cir. 2020).[6] As in *Nixon*, the Third Circuit engaged in an extensive analysis of *Tinker*, *Fraser*, and *Hazelwood* to conclude that administrators cannot reach off-campus to punish a student's speech on social media. *Id.* Like the courts in *Nixon* and *Mahanoy*, the district court should have looked to longstanding precedent and found that Diei's speech on social media was protected under clearly established law.

---

[6] The Supreme Court affirmed the Third Circuit in *Mahanoy*, 141 S. Ct. at 2048. While the Court did not adopt the Third Circuit's reasoning in its entirety, the throughline remained—schools have a weakened interest in regulating student speech when they speak off-campus.

For these reasons, qualified immunity does not protect Defendants George or Boyd, and the district court erred by concluding that "no precedent clearly instructed school officers that the type of speech in this litigation, social media posts, was exempt from compliance with school policy." Order, R. 69, Page ID # 635.

### C. Defendant George violated clearly established law by voting to expel Diei.

It is also clearly established that instituting disciplinary proceedings against a student in retaliation for protected speech would deter a student of ordinary firmness from speaking. In *Thompson*, a student sued a professor for First Amendment retaliation after the professor filed a complaint accusing the student of violating the student code of conduct. 990 F. Supp. 2d at 806–08. The professor argued that he was entitled to qualified immunity because "there was no 'clearly established law' that would have put [the professor] on notice that the 'mere filing of a conduct charge' would be an adverse action for First Amendment retaliation purposes." *Id*. at 812 (citation omitted). The court rejected the professor's argument, noting that the plaintiff specifically alleged that the professor made the report *because of* the plaintiff's protected speech. *Id.*

That motive is significant because "[i]n the context of a retaliation claim, the focus of the qualified immunity analysis is on the retaliatory intent of the defendant." *Id*. Here, Diei specifically alleged Chairperson George punished Diei because of her social media posts. Compl., R. 1, Page ID ## 10, 16. That Chairperson George said so during both investigations into Diei's posts is powerful evidence of intent. *Id*. To that end, George is not entitled to qualified immunity for deliberately punishing Diei because of her viewpoints on music, culture, and sexuality—viewpoints that Diei, an adult woman, expressed on her personal social media accounts.

Similarly, in *Schlissel*, the court explained that "the threat of punishment from a public official who appears to have punitive authority can be enough to produce an objective chill." 939 F.3d at 764. Chairperson George must have known that even the threat of expulsion would chill Diei's speech, but she punished Diei anyway. Qualified immunity does not shield her.

54

### D.   Qualified immunity does not protect Defendants' considered decision to expel Diei under their professionalism policy.

Defendants had months to consider Diei's expressive rights and the constitutional limits on their policy. Chairperson George and the Committee punished her for her speech anyway, highlighting why the Court should reverse the district court's grant of qualified immunity. Often, courts grant qualified immunity where police confront split-second decisions, sometimes involving life and death, that ultimately violate a plaintiff's constitutional rights.[7] But what constitutes "fair notice" for police officers in cases of hot pursuit or potentially dangerous public interactions can be quite different from "fair notice" when the official has time to deliberate before exercising his or her discretion.

Thus, where officials have time to consider the constitutional limits on their acts, but they still violate the Constitution, they should not get

---

[7] *See, e.g.*, *Gray v. Cummings*, 917 F.3d 1, 9–13 (1st Cir. 2019) (qualified immunity for officer who used taser in attempting to regain custody of mentally ill person); *Morrow v. Meachum*, 917 F.3d 870, 876–77 (5th Cir. 2019) (qualified immunity for officer who attempted to stop suspect fleeing on a motorcycle by performing a "rolling bloc," thereby crashing and killing the suspect); *Brown v. City of New York*, 862 F.3d 182, 190–92 (2d Cir. 2017) (qualified immunity for officer who used pepper spray on plaintiff who was resisting arrest).

qualified immunity. Any other rule turns the immunity into a blunt tool that strips plaintiffs of a constitutional remedy, no matter the circumstances. As Justice Thomas observed, such a "one-size-fits-all doctrine is [] an odd fit for many cases because the same test applies to officers who exercise a wide range of responsibilities and functions." *Hoggard v. Rhodes*, 141 S. Ct. 2421 (2021) (Thomas, J., on denial of certiorari). The Eighth Circuit recently put a fine point on this issue that echoes Diei's concerns here: "[A]s Justice Thomas asked . . . 'why should university officers, who have time to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a split-second decision . . . ?'" *Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 867 (8th Cir. 2021) (citing *Hoggard*, 141 S. Ct. at 2422 (Thomas, J., on denial of certiorari)).

Unlike officers facing exigent, split-second decisions, Defendants had months to deliberate about whether the Constitution limited their power to investigate and expel Diei for her social media posts. There was no hot pursuit. Diei's online posts were not threatening or seriously harming anyone on campus. In short, qualified immunity should not

shield Chairperson George, who made a deliberate decision to violate Diei's First Amendment freedoms in the face of clear precedent limiting her acts. And it should not shield President Boyd, who is responsible for promulgating, implementing, and enforcing the professionalism policy. Chairperson George twice invoked that policy to investigate Diei's online speech, and ultimately to expel Diei. The Court should reverse the district court's grant of qualified immunity.

## V.     Defendants' Policy Is Overbroad and Vague, and Diei Has Standing to Challenge It.

Diei seeks retrospective declaratory relief tied to her claims for damages. For this reason, they continue to "supply the constitutional requirement of a case or controversy" to support standing. *Powell v. McCormack*, 395 U.S. 486, 497 (1969).

In their motion to dismiss, Defendants identified the "Standards of the Health Professions" as the policy the Committee used to punish Diei. That policy states that University of Tennessee Health Science Center students may be suspended or dismissed for the following, either on- or off-campus:

> [U]nprofessional and unethical conduct which would bring disrepute and disgrace upon both student and profession and which would tend to

> substantially reduce or eliminate the student's
> ability to effectively practice the profession in
> which discipline he or she is enrolled.

Official Capacity Defs.' Mot. to Dismiss, R. 25-1, Page ID # 274. This language is facially unconstitutional because it applies to a broad range of expression and expressive conduct and does not provide students notice of what is proscribes as "disgraceful" or "disreputable," instead leaving administrators unbridled discretion to do so. The district court erred by concluding that the policy was facially valid. Diei is entitled to retrospective declaratory relief on her facial claims against the University of Tennessee Board of Trustees and Defendants George and Boyd in their official capacities.

## A.   Diei's facial claims seek retrospective declaratory relief tied to her as-applied claims.

Diei's claims for damages and retrospective declaratory relief present a live dispute for two reasons. First, Diei's graduation in May 2023 does not moot her claim for retrospective relief in the form of damages. *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 387–88 (6th Cir. 2005). Second, the three declaratory judgments Diei seeks in her complaint are based on the Defendants' same conduct that supports her claim for damages.

Diei acknowledges that her graduation moots her claims for prospective injunctive relief. But claims for retrospective declaratory relief continue to present a live controversy so long as they are tied to a claim for damages. *PETA v. Rasmussen*, 298 F.3d 1198, 1202–03 (10th Cir. 2002) (concluding protestors could assert claim for retrospective declaratory relief along with damages claim after defendants conceded the ordinance in question did not apply to their protest activities).

Diei is seeking damages because, for example, Defendants unconstitutionally applied their policy to her in retaliation for her protected speech on social media. Compl., R. 1. Her claims for declaratory judgment that: Defendants unconstitutionally applied their policy to her speech on social media; the policy is vague; and the policy is overbroad, are directly tied to Chairperson George's retaliatory, unconstitutional application of President Boyd's policy. For these reasons, Diei has standing to assert her claims for retrospective relief.

## B. Defendants' policy unconstitutionally limits expression and expressive conduct.

The "Standards of the Health Professions" policy that Defendants contend they used to punish Diei is unconstitutionally overbroad. A regulation is overbroad if it is (1) related to the suppression of expression,

including expressive conduct; (2) does not "further an important or substantial government interest[;]" and (3) "burden[s] substantially more speech than necessary to further [the] interest." *Blau*, 401 F.3d 381 at 391 (citations omitted). Therefore, the College of Pharmacy's policy may not restrict more expression than is necessary to further its interest in training future pharmacists. It does.

Defendants' policy burdens a broad range of expression—including online off-campus expression—for no legitimate pedagogical reason. Compl., R. 1, Page ID ## 18–19. For example, the policy applies to "misconduct" that "bring[s] disrepute or disgrace" to the speaker or the College of Pharmacy. This prohibition has more than an "incidental" effect on speech. *Becerra*, 138 S. Ct. at 2372. It sweeps within its ambit speech, on- or off-campus, that is unrelated to pharmacy school but offends or is "disagreeable." *Barr*, 538 F.3d at 568. But disagreeable or offensive speech is protected. *Johnson*, 491 U.S. at 414.

To comply with the First Amendment, professionalism policies must further a legitimate pedagogical interest. *Ward*, 667 F.3d at 734. But Defendants have no interest in regulating, for example, an adult student's off-campus expression about music and sexuality on social

media, which is entirely unrelated to pharmacy. Because the policy is not tailored to the University's legitimate interests and applies on- and off-campus, it unlawfully prohibits more speech than is necessary to further that interest and is overbroad.

### C. Defendants' policy does not provide fair notice of what it proscribes.

Defendants' "Standards of the Health Professions" policy does not provide students fair notice of what expression it prohibits and is standardless, which allows administrators like Chairperson George to employ it to punish speech they do not like. "[T]he vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement . . . ." *McGlone v. Cheek*, 534 F. App'x 293, 297 (6th Cir. 2013) (internal quotation omitted).

A regulation violates the Due Process Clause of the Fourteenth Amendment as vague if a person of ordinary intelligence cannot distinguish between the permissible and the prohibited. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The policy does not define "disrepute" or "disgrace." There is no guidance that provides a "workable standard" for speech that brings disrepute, as opposed to speech that is benign enough for the College to accept. *Am. Freedom Def. Initiative v.*

*Suburban Mobile Auth.*, 978 F.3d 481, 494–95 (6th Cir. 2020).

For similar reasons, the policy also provides the Committee with unbridled discretion to enforce its terms. The vagueness doctrine "protects citizens against the impermissible delegation of basic policy matters 'for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.'" *Miller v. City of Cincinnati*, 622 F.3d 524, 539 (6th Cir. 2010) (citation omitted). The policy and its undefined terms of "disrepute" and "disgrace" leave to the Committee to determine what is too "sexual" for an adult to post on their personal social media account. But what is too "sexual" or "vulgar" as to bring "disrepute" for Chairperson George may not be so for another administrator, or for the students to whom the policy applies. During the Committee's 2020 investigation of Diei, for example, Chairperson George could not explain what policy or provision Diei's posts allegedly violated. Compl., R. 1, Page ID # 14. This policy allows her to replace any objective standard with her own preference for what student speech warrants punishment. For these reasons, the policy is unconstitutionally vague.

# CONCLUSION

For the foregoing reasons, Diei asks the Court to reverse the district court's judgment dismissing her claims under the First and Fourteenth Amendments to the United States Constitution, including her claims for retrospective declaratory relief.

Dated: December 8, 2023

/s/ Greg H. Greubel

GREG H. GREUBEL
  *Counsel of Record*
KATLYN A. PATTON
JT MORRIS
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, Pennsylvania 19106
(215) 717-3473
katlyn.patton@thefire.org
greg.greubel@thefire.org
jt.morris@thefire.org

*Counsel for Appellant*

## Certificate of Compliance With Type-Volume Limit

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f), this document contains 12,679 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.


Date: December 8, 2023                    /s/ Greg H. Greubel
                                          Greg H. Greubel
                                          FOUNDATION FOR INDIVIDUAL
                                           RIGHTS AND EXPRESSION

# PLAINTIFF-APPELLANT'S DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to 6. Cir. R. 30(b), Plaintiff-Appellant hereby designates the following filings in the district court's electronic record to be relevant documents for purposes of this appeal:

### U.S. District Court
### Western District of Tennessee (Western Division)
### CIVIL DOCKET FOR CASE #: 2:21-cv-02071

| DESCRIPTION OF ENTRY | DATE FILED | RECORD ENTRY NO. | Page ID # Range |
|---|---|---|---|
| Plaintiff-Appellant's Complaint | 02/03/2021 | 1 | 1–31 |
| Individual Capacity Defendants' Motion to Dismiss | 03/01/2021 | 24 | 165–96 |
| Official Capacity Defendants' Motion to Dismiss | 03/01/2021 | 25 | 260–82 |
| Plaintiff-Appellant's Opposition to Motions to Dismiss | 04/09/2021 | 32 | 297–63 |
| Defendants' FERPA Objections | 06/24/2022 | 56 | 443–66 |
| Plaintiff-Appellant's Corrected Motion for Discovery | 06/27/2022 | 60 | 506–24 |
| Defendants' Motion to Dismiss | 05/10/2023 | 64 | 531–45 |
| Order Granting Motion to Dismiss | 08/03/2023 | 69 | 616–42 |
| Notice of Appeal | 08/24/2023 | 72 | 644–46 |

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 8, 2023, an electronic copy of the Appellant's Opening Brief was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: December 8, 2023

/s/ Greg H. Greubel
_____

GREG H. GREUBEL
  *Counsel of Record*
KATLYN A. PATTON
JT MORRIS
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, Pennsylvania 19106
(215) 717-3473
greg.greubel@thefire.org
katlyn.patton@thefire.org
jt.morris@thefire.org