## CASE NO. 23-5771

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

KIMBERLY DIEI,

*Appellant/Plaintiff,*

-vs-

RANDY BOYD, et al.,

*Appellees/Defendants.*

_____

On Appeal from the Judgment of the United States
District Court for the Western District of Tennessee
(2:21-cv-02071-JTF-cgc)

---

## REPLY BRIEF FOR APPELLANT

---

GREG H. GREUBEL
  *Counsel of Record*
JT MORRIS
RAUL A. RUIZ
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street, Suite 900
Philadelphia, PA 19106
(215) 717-3473
greg.greubel@thefire.org
jt.morris@thefire.org
raul.ruiz@thefire.org
*Attorneys for Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

PRELIMINARY STATEMENT ................................................. 1

ARGUMENT.................................................................................. 4

I.   Defendants Cannot Apply Their Professionalism
     Rules to Punish Diei for Expressing Her Views on
     Sexuality.................................................................................. 4

     A.   Defendants' application of their
          professionalism rule was pretextual and
          aimed to punish Diei's viewpoint................................... 4

     B.   Defendants' vague and overbroad
          professionalism rule armed Defendants with
          unbridled discretion. .................................................... 10

     C.   Punishing pharmacists for "crude," "vulgar,"
          and "sexual" speech is not a recognized
          standard of the profession of pharmacy. ..................... 12

     D.   Diei's First Amendment as-applied,
          viewpoint discrimination claims are distinct
          from her retaliation claim. ........................................... 15

II.  Defendants' Voting to Expel Students For
     Expressing Their Views Objectively Chills Speech
     and Caused Diei to Self-Censor. ........................................... 16

III. Defendants Boyd and George Are Not Entitled to
     Qualified Immunity. ............................................................... 23

     A.   The law was clearly established that
          university administrators cannot use
          professionalism codes as a pretext to punish
          students' viewpoints...................................................... 24

B.    The law was clearly established that university administrators cannot retaliate against students for expressing their viewpoints. ................................................... 28

IV.   Diei's Requests for Declaratory Relief Are Not Moot. ......................................................................... 32

CONCLUSION ........................................................................ 34

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Al-Dabagh v. Case Western Reserve Univ.*,
777 F.3d 355 (6th Cir. 2015) .......................................................... 6, 8, 9

*Anders v. Cuevas*,
984 F.3d 1166 (6th Cir. 2021) ............................................................ 16

*Axson-Flynn v. Johnson*,
356 F.3d 1277 (10th Cir. 2004) .....................................................*passim*

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) .......................................................................... 21

*Barron v. Univ. of Notre Dame du Lac*,
93 F. Supp. 3d 906 (N.D. Ind. 2015) ................................................. 18

*Bell v. Johnson*,
308 F.3d 594 (6th Cir. 2002) ............................................................ 17

*Benison v. Ross*,
765 F.3d 649 (6th Cir. 2014) ........................................................*passim*

*Blake v. Wright*,
179 F.3d 1003 (6th Cir. 1999) ........................................................... 27

*Blankenship v. Manchin*,
471 F.3d 523 (4th Cir. 2006) ........................................................ 18, 23

*Blau v. Fort Thomas Pub. Sch. Dist.*,
401 F.3d 381 (6th Cir. 2005) ............................................................ 33

*Brown v. Jones County Junior College*,
463 F. Supp. 3d 742 (S.D. Miss. 2020) .......................................... 19, 23

*Cahoo v. SAS Analytics Inc.*,
  912 F.3d 887 (6th Cir. 2019 ................................................................. 24

*Coszalter v. City of Salem*,
  320 F.3d 968 (9th Cir. 2003) ........................................................... 18, 23

*Country Mill Farms, LLC v. City of E. Lansing*,
  280 F. Supp. 3d 1029 (W.D. Mich. 2017) ........................................... 15

*Daugherty v. Campbell*,
  935 F.2d 780 (6th Cir.1991) ................................................................. 29

*Davis v. Robert*,
  192 F. Supp. 3d 847 (E.D. Mich. 2016) ............................................... 19

*Harris v. Blake*,
  798 F.2d 419 (10th Cir. 1986) ......................................................... 22, 23

*Harris v. Detroit Pub. Schs.*,
  245 F. App'x 437 (6th Cir. 2007) ......................................................... 18

*J. Endres v. Ne. Ohio Med. Univ.*,
  938 F.3d 281 (6th Cir. 2019) ........................................................... 22, 23

*Keefe v. Adams*,
  840 F.3d 523 (8th Cir. 2016) ........................................................*passim*

*Ku v. State of Tennessee*,
  322 F.3d 431 (6th Cir. 2003) ........................................................... 7, 8, 9

*Matal v. Tam*,
  137 S. Ct. 1744 (2017) ......................................................................... 30

*McElhaney v. Williams*,
  81 F.4th 550 (6th Cir. 2023) ................................................................. 28

*Myers v. City of Centerville, Ohio*,
  41 F.4th 746 (6th Cir. 2022) ................................................................. 28

*OSU Student All. v. Ray,*
    699 F.3d 1053 (9th Cir. 2012) ............................................................. 29

*Oyama v. Univ. of Hawaii,*
    813 F.3d 850 (9th Cir. 2015) ........................................................*passim*

*Papish v. Bd. of Curators of Univ. of Missouri,*
    410 U.S. 667 (1973) ................................................................. 3, 24, 25

*PETA v. Rasmussen,*
    298 F.3d 1198 (10th Cir. 2002) ........................................................... 33

*Powell v. McCormack,*
    395 U.S. 486 (1969) ............................................................................. 32

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ............................................................................. 15

*Reno v. ACLU,*
    521 U.S. 844 (1997) ............................................................................. 26

*Robinson v. Hunt County,*
    921 F.3d 440 (5th Cir. 2019) ............................................................... 30

*Rosemond v. Markham,*
    135 F. Supp. 3d 574 (E.D. Ky. 2015) ................................................... 14

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
    515 U.S. 819 (1995) ...................................................................... 27, 30

*Rutan v. Republican Party of Illinois,*
    497 U.S. 62 (1990) ............................................................................... 18

*Sensabaugh v. Halliburton,*
    937 F.3d 621 (6th Cir. 2019) ............................................................... 18

*Seoane-Vazquez v. Ohio State Univ.,*
    577 F. App'x 418 (6th Cir. 2014) ......................................................... 18

*Serafine v. Branaman,*
   810 F.3d 354 (5th Cir. 2016) ................................................................ 14

*Speech First, Inc. v. Schlissel,*
   939 F.3d 756 (6th Cir. 2019) ................................................ 21, 23, 28

*Thaddeus-X v. Blatter,*
   175 F.3d 378 (6th Cir. 1999) ................................................................ 17

*Thompson v. Ohio State Univ.,*
   990 F. Supp. 2d 801 (S.D. Ohio 2014) ................................................ 30

*Thompson v. Ohio State Univ.,*
   92 F. Supp. 3d 719 (S.D. Ohio 2015) ............................................ 30, 31

*Thompson v. Ohio State Univ.,*
   639 F. App'x 333 (6th Cir. 2016) .................................................... 30, 31

*United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l
   Transit Auth.,*
   163 F.3d 341 (6th Cir. 1998) ................................................................ 10

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
   425 U.S. 748 (1976) .............................................................. 11, 14, 15

*Wolff v. McDonnell,*
   418 U.S. 539 (1974) .............................................................................. 32

## Preliminary Statement

In this First Amendment case, a public university threatened to expel pharmacy student Kimberley Diei for her off-campus social media posts on her personal, pseudonymous accounts about popular culture, song lyrics, and women's sexuality. Although none of her posts were related to her coursework or the practice of pharmacy, a disciplinary committee launched an investigation and voted unanimously to expel her because her posts were too "sexual," "crude," and "vulgar." That's viewpoint discrimination.

Defendants cannot avoid Diei's well-pled allegations that they discriminated and retaliated against her because of her social media posts. Instead, Defendants try to skirt these facts, asking the Court to simply defer to their judgment. But unlike cases where courts deferred to a university's determination of professionalism or academic standards like grading, Diei was punished for off-campus speech unrelated to her studies. Simply calling her speech "unprofessional" does not refashion the university's decision to punish Diei for off-campus, personal views into an "academic" judgment. Indeed, this Court has cautioned these decisions from university officials require careful scrutiny to ensure they

are not pretexts for viewpoint discrimination, as Diei has alleged. None of the professionalism standards that Defendants cite prohibit pharmacists or pharmacy students from using "crude," "vulgar," or "sexual" speech online.

Diei states independently viable claims for retaliation, which requires an adverse action, and viewpoint discrimination, which does not. Defendants conflate these claims and assert there was no adverse action. But whether the threat of expulsion would have chilled the speech of a reasonable student is a question of fact. Not only did Diei detail how the threat of expulsion forced her to self-censor for two years, but that threat would chill any ordinary student pursuing a career-defining degree. Defendants' contention that only final decisions qualify as adverse actions ignores established First Amendment principles and misrelies on cases from the employment and procedural due process contexts.

Qualified immunity does not save Defendants Boyd and George. While they insist only a factually identical case defeats qualified immunity, the Supreme Court has rejected that standard. Instead, fair warning of a First Amendment violation is the benchmark, and Boyd and George had it. For more than a decade, this Circuit has clearly

established that university administrators cannot use professionalism rules as a pretext to punish students' viewpoints. *Ward v. Polite*, 667 F.3d 727, 734 (6th Cir. 2012). And for a half-century, the Supreme Court has clearly established that universities cannot punish students because administrators find students' speech indecent or crude. *Papish v. Bd. of Curators of Univ. of Missouri*, 410 U.S. 667, 670 (1973). Defendants had months to consider this precedent but ignored it.

Finally, Diei's graduation does not moot her requests for retrospective declaratory relief against Defendants Boyd and George in their individual capacities. Defendants concede this Court has jurisdiction over Diei's damages claims. *Defs.' Br.*, COA R. 23, Page ID # 22.[1]

By threatening to expel Diei because of views she expressed in plainly protected social media posts, Defendants attempted to police Diei's personal speech. But the First Amendment forbids that abuse of power. The Court should reverse the dismissal of Diei's Fourth and Fifth Causes of Action.

---

[1] Diei acknowledges her claims for retrospective declaratory relief against the official capacity Defendants are barred by the Eleventh Amendment.

## ARGUMENT

### I.    Defendants Cannot Apply Their Professionalism Rules to Punish Diei for Expressing Her Views on Sexuality.

Defendants assert that Diei "challenges the very notion that her professionalism may be regulated." *Defs.' Br.*, COA R. 23, Page ID # 42. That is inaccurate. Diei argues that the First Amendment bars Defendants from using professionalism rules as a pretext to punish views she expressed off-campus. Unlike the plaintiffs in the cases cited by Defendants, who were punished for unprofessional conduct, Defendants punished Diei because she expressed "sexual" and "crude" views on social media, unrelated to academic matters or the practice of pharmacy. Put simply, they punished her for protected speech.

### A.    Defendants' application of their professionalism rule was pretextual and aimed to punish Diei's viewpoint.

Defendants ask that the Court defer to their decision to investigate and attempt to expel Diei on professionalism grounds as an academic judgment. *Defs.' Br.*, COA R. 23, Page ID ## 44–45, 48. But Defendants cannot cloak viewpoint discrimination behind the veil of professionalism. While courts often defer to academic judgments to "not second-guess the *pedagogical* wisdom or efficacy of an educator's goal," this Court cannot "abdicat[e] [its] judicial duty" by "fail[ing] to investigate whether the

4

educational goal or pedagogical concern was *pretextual.*" *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1292–93 (10th Cir. 2004). Diei posted about her private life off-campus, not about the practice of pharmacy or coursework. None of her posts implicated any professional goals or pedagogical concerns. Yet, Defendants abused their authority by punishing her private speech. Far from establishing that Defendants may regulate any speech of professional students, the professionalism cases cited by Defendants show that Diei alleged impermissible viewpoint discrimination.

Start with *Ward,* where this Court established that when plaintiffs allege viewpoint discrimination, courts must look beyond the application of a professional rule. 667 F.3d at 734. There, this Court held that university administrators may not "invoke curriculum as a pretext for punishing" a student because of her viewpoint. *Id.* (internal quotes and citation omitted). This rule extends beyond the Sixth Circuit. Sister circuits also have ruled that universities cannot pretextually use professionalism rules to punish viewpoints. *Keefe v. Adams*, 840 F.3d 523, 530 (8th Cir. 2016) (holding that a university may violate the First Amendment if it invokes a curriculum-based code of ethics as a pretext

to punish a student's views); *Oyama v. Univ. of Hawaii*, 813 F.3d 850, 867–68 (9th Cir. 2015) (same); *Axson-Flynn*, 356 F.3d at 1292–93 (same). These cases make clear Diei stated a First Amendment violation by alleging that Defendants pretextually enforced a professionalism rule to censure her expression about sexuality.

Still, Defendants rely on these cases and others for the proposition that "(1) institutions of higher education may require their professional students to adhere to the professional standards of the profession they are preparing to enter; (2) those professional standards may regulate conduct that involves speech; and (3) the speech that may be permissibly regulated includes off campus, on-line speech such as social media posts." *Defs.' Br.*, COA R. 23, Page ID # 47. But these generalities obfuscate the real issue: Defendants violated the First Amendment because they targeted Diei for expressing her views on popular culture, women's sexuality, and song lyrics—subjects unrelated to pharmacy—with no legitimate pedagogical purpose.

None of Defendants' cases permits viewpoint discrimination. In *Al-Dabagh*, this Court deferred to a university's academic judgment not to award a degree on professionalism grounds. *Al-Dabagh v. Case Western*

6

*Reserve Univ.*, 777 F.3d 355, 359 (6th Cir. 2015). The student in *Al-Dabagh* did not raise a First Amendment challenge, and the university relied on his conduct to determine he was unprofessional. *Id.* Specifically, the plaintiff was late to thirty percent of class meetings, convicted for driving while intoxicated, harassed classmates at a formal dance, and received "a stinging evaluation about his performance in an internal medicine internship[.]" *Id.* at 357–58. Al-Dabagh's egregious misconduct is a far cry from Diei's protected speech and, thus, readily distinguishable.

Similarly, in *Ku*, the plaintiff did not bring a First Amendment claim, and was punished for academic conduct like failing courses and a pre-licensing exam. *Ku v. State of Tennessee*, 322 F.3d 431, 435 (6th Cir. 2003). Notably, this Court highlighted that Ku had "not presented a shred of evidence that the College's actions constitute[d] a substantial departure from accepted academic norms *or were otherwise taken in bad faith*." *Id*. at 438 (emphasis added). In contrast, Diei's First Amendment claim is premised on the Defendants' bad-faith application of their professionalism standards to her protected expression.

7

The facts in *Keefe* are also vastly different than Diei's allegations. There, the Eighth Circuit held "speech reflecting non-compliance with [the Nurses Association Code of Ethics] *that is related to academic activities* materially disrupts the Program's legitimate pedagogical concerns." *Keefe*, 840 F.3d at 531 (emphasis added) (cleaned up). Mining a summary judgment record, the court found Keefe had been punished for Facebook posts related to course assignments or requirements. *Id.* at 532. Keefe's posts directly targeted classmates and included an ostensible threat. *Id*. The record reflected that Keefe's posts "had a direct impact on the students' educational experience" and "had the potential to impact patient care." *Id*. And unlike Diei, Keefe did not allege that "defendants' reliance on the Nurses Association Code of Ethics was a pretext for viewpoint, or any other kind of discrimination." *Id.* at 530.

Diei's posts on popular culture, song lyrics, and women's sexuality do not compare to the conduct in *Al-Dabagh*, *Ku*, or *Keefe*. Unlike in *Al-Dabagh* and *Ku*, Diei's online social media posts were pure speech and unrelated to her academic program. *Compl.*, R. 1, Page ID # 23. Moreover, unlike the plaintiffs in *Al-Dabagh, Ku,* and *Keefe*, Diei has

alleged that the Defendants' professionalism determination was a pretext for viewpoint discrimination. *Id. at* ## 14–16, 23, 26.

Defendants likewise stretch the holdings of *Keeton* and *Oyama*. In *Keeton*, the university's enforcement of the relevant code of ethics was directly tied to the practice of counseling in a practicum. *Keeton v. Anderson-Wiley*, 664 F.3d 865, 877 (11th Cir. 2011) (Keeton sought to "disregard the limits [her university had] established for its clinical practicum and set her own standards for counseling clients in the clinical practicum."). In *Oyama*, only after declaring that universities cannot make certification decisions based on disagreements with students' views, 813 F.3d at 867–68, did the Ninth Circuit ultimately rule in favor of the university. It did so because the university's denial of the plaintiff's student teaching application was "related directly to defined and established professional standards" concerning student-teacher sexual relationships and teaching students with disabilities. *Id.* at 868.

Unlike in *Keeton* and *Oyama*, Diei's posts have no relation to the academic standards of a practicum or the appropriate boundaries between a professional and her constituents. Diei's posts are unlike the conduct punished in *Oyama, Keeton*, *Ku*, *Keefe*, and *Al-Dabagh* because

9

they did not invoke any academic interest. Rather, the First Amendment fully protected her personal, off-campus speech.

## B.    Defendants' vague and overbroad professionalism rule armed Defendants with unbridled discretion.

Defendants ask this Court to blindly accept its application of their professionalism rule and "abdicat[e] [its] judicial duty." *Axson-Flynn*, 356 F.3d at 1292–93. But Defendants' professionalism rule does not define what behaviors or speech are unprofessional; it merely tells students that they could be punished for being unprofessional, leaving that determination to the unbridled discretion of administrators. *United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 359 (6th Cir. 1998) ("[A] statute or ordinance offends the First Amendment when it grants a public official unbridled discretion such that the official's decision to limit speech is not constrained by objective criteria, but may rest on ambiguous and subjective reasons.") (cleaned up). The College's vague professionalism rule is dangerous because it invites exactly the "arbitrary and discriminatory application" Defendants employed against Diei. *Id.*

Only one phrase in the College's professionalism rule arguably limits its application. "*[C]onduct*" is unprofessional if it "would tend to

substantially reduce or eliminate the student's ability to effectively practice the profession . . . ." *Defs.' Br.*, COA R. 23, Page ID # 19 (quoting rule) (emphasis added). This phrase suggests any application of this professionalism rule must have a direct connection to the program's academic activities. But that direct connection does not exist here. As Diei alleged, Defendants never told her that her online posts would "reduce or eliminate" her "ability to effectively practice" pharmacy. *See Compl.*, R. 1, Page ID ## 14–16, 23, 26.

The circular nature of Defendants' professionalism code further suggests its pretextual application to Diei. *Virginia Pharmacy Board*, which Defendants cite, *Defs.' Br.*, COA R. 23, Page ID # 42, stands for the principle that the state must define the professionalism rules it expects pharmacists to exhibit. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 752 (1976) (noting that "unprofessional conduct" for which the Board can punish a pharmacist is "specifically defined" in statute). Like the statute in *Virginia Pharmacy Board*, the professionalism code upheld in *Keefe* was far more definite than Defendants' limitless code. *Keefe*'s Nurses Association Code of Ethics defines the ethics of "Relationships with colleagues and others"

and "Professional boundaries," 840 F.3d at 528–29, which directly regulated the behaviors punished in that case.

There are circumstances where courts defer to academic judgments based on professionalism standards, as these cases demonstrate. Those circumstances lack here: Diei has alleged Defendants used their policies to punish her for expressing viewpoints. Because this case is still at the pleading stage, Defendants cannot set aside Diei's allegations and hide behind their vague and unbounded professionalism rule.

### C.    Punishing pharmacists for "crude," "vulgar," and "sexual" speech is not a recognized standard of the profession of pharmacy.

Defendants' professionalism rule does not address allegedly "crude," "vulgar," and "sexual" speech—but Defendants punished Diei anyway. This omission is fatal. The Ninth Circuit, relying on *Ward* and *Axson-Flynn*, recognized that "universities may consider students' speech in making certification decisions, *so long as their decisions are based on defined professional standards*, and not on officials' personal disagreement with students' views." *Oyama*, 813 F.3d at 867–68 (emphasis added). Neither the statute cited by Defendants nor

Defendants' professionalism rule defines unprofessionalism to include "crude," "vulgar," or "sexual" speech.

Defendants offer the following provision from the Tennessee Board of Pharmacy's professionalism standard:

> A pharmacist shall observe the law, uphold the dignity and honor of the profession, and accept its ethical principles. A pharmacist shall not engage in any activity that will bring discredit to the profession, and shall expose, without fear or favor, illegal or unethical conduct in the profession.

*Defs.' Br.*, COA R. 23, Page ID # 18.

Contrary to the specificity required by both the First Amendment and cases like *Ward*, *Axson-Flynn*, and *Oyama*, this provision does not define what behaviors "uphold the dignity and honor of the profession" or which "activit[ies] . . . will bring discredit to the profession." It also does not define "unethical conduct in the profession." Most importantly, it never mentions "crude," "vulgar," or "sexual" speech as grounds for punishing a pharmacist, let alone a pharmacy student.

Defendants' professionalism policy fares no better. It fails to define "unprofessional," "unethical," and "conduct that would bring disrepute and disgrace upon both student and profession." *Defs.' Br.*, COA R. 23, Page ID # 19 (quoting rule). Again, at no point does this provision

13

prohibit speaking about "sexual" topics or using "crude" or "vulgar" language" on social media. Unlike the limited statute in *Pharmacy Board*, Defendants' rule leaves unlimited discretion to the administrators applying it, and this is the only rule Defendants offer in asking this Court to defer to its decision to punish Diei. *Defs.' Br.*, COA R. 23, Page ID ## 18–19. This Court should find that Defendants' professionalism rule is no shield against Diei's viewpoint discrimination claim.

Lastly, even if this rule *did* ban "vulgar," "crude," or "sexual" speech, it would still not trump Diei's allegations. As Diei argued, the State could not have punished Diei for her social media posts if she was a pharmacist. *See Pl.'s Br.*, COA R. 20, Page ID ## 40–41. The professional-speech doctrine, which allows the government "to regulate speech in limited circumstances so as to protect the individual receiving advice—the client," simply does not apply here. *Rosemond v. Markham*, 135 F. Supp. 3d 574, 584 (E.D. Ky. 2015) (relying on *Lowe v. S.E.C.*, 472 U.S. 181, 232 (1985) (White, J., concurring)). Diei's personal social media posts do not address any client, classmate, patient, professor, or student. *See Serafine v. Branaman*, 810 F.3d 354, 360 (5th Cir. 2016) (holding that a political candidate's statements on her website were "entitled to full

14

First Amendment protection" because she was not providing psychological advice and communicated with the public at large, not a client). The First Amendment even bars professionalism rules that ban pharmacists from advertising drug prices. *Va. State Bd. of Pharmacy*, 425 U.S. at 770. It is inconceivable that professionalism rules could permissibly ban personal expression unrelated to pharmacy practice.

### D. Diei's First Amendment as-applied, viewpoint discrimination claims are distinct from her retaliation claim.

Defendants conflate Diei's as-applied, viewpoint discrimination challenge against President Boyd and Chairperson George in their individual capacities (Count Four) with her First Amendment retaliation claim against George in her individual capacity (Count Five). *Defs.' Br.*, COA R. 23, Page ID # 33. However, those claims are distinct. *Country Mill Farms, LLC v. City of E. Lansing*, 280 F. Supp. 3d 1029, 1042–48 (W.D. Mich. 2017) (analyzing First Amendment retaliation claim separately from First Amendment as-applied claims). Unlike a retaliation theory, viewpoint discrimination claims do not require plaintiffs to plead an adverse action. *Id.* at 1042–43. Instead, those claims need only plead that government officials discriminated against an

expressed view. *See Reed v. Town of Gilbert*, 576 U.S. 155, 167 (2015) ("the First Amendment expressly targets the operation of the laws—i.e., the 'abridg[ement] of speech'—rather than merely the motives of those who enacted them.").

Thus, Defendants' argument in favor of dismissing Diei's viewpoint discrimination claim based on a lack of "adverse action" fails. And, as explained next, Defendants cannot avoid liability by claiming that voting to expel students does not chill speech.

## II. Defendants' Voting to Expel Students For Expressing Their Views Objectively Chills Speech and Caused Diei to Self-Censor.

Defendants propose university administrators may retaliate against students for protected speech if the university reverses the retaliatory action. *Defs.' Br.*, COA R. 23, Page ID # 33. Defendants scrounge up employment and procedural due process cases to assert only "final, non-appealable" decisions may qualify as adverse actions. *Id.*, Page ID ## 33–39. But well-settled First Amendment retaliation principles and Sixth Circuit student speech precedent prove them wrong.

An "adverse action" is any act of a government official that would chill a reasonable speaker's First Amendment rights. *Anders v. Cuevas*,

984 F.3d 1166, 1176 (6th Cir. 2021) (citations omitted). "Whether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights *is a question of fact*." *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002) (emphasis added). The analysis of an adverse action in First Amendment cases must be "tailored to the different circumstances in which retaliation claims arise." *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999) (en banc). Because "nothing justifies 'harassing people for exercising their constitutional rights,' … the deterrent effect on speech 'need not be great' to be actionable." *Anders*, 984 F.3d at 1176 (quoting *Thaddeus-X*, 175 F.3d at 397).

Here, Diei self-censored her speech every day for two years because she reasonably feared Chairperson George would deem her expression "sexual," "crude," or "vulgar" and once again launch a disciplinary investigation against her. *Compl.*, R. 1, Page ID # 17. Chairperson George's push to expel Diei would deter students of ordinary firmness from exercising their right to free speech. *Id.*, Page ID ## 28–29. Defendants may not simply ignore these allegations at the pleading stage.

Although Defendants acknowledge adverse actions must be analyzed in the "appropriate context," they rely primarily on employment cases. *Defs' Br.*, COA R. 23, Page ID ## 33–35, 40–42 (discussing *Benison v. Ross,* 765 F.3d 649 (6th Cir. 2014); *Harris v. Detroit Pub. Schs.*, 245 F. App'x 437 (6th Cir. 2007); *Sensabaugh v. Halliburton*, 937 F.3d 621 (6th Cir. 2019). These employment cases do not stand for the proposition that "[t]he lawfulness of the 'final decision' and 'ultimate act' is what matters" when analyzing whether a retaliatory act is adverse. *Defs.' Br.*, COA R. 23, Page ID # 39. In fact, "subsequent decisions have retreated from the 'ultimate employment decision' standard." *Barron v. Univ. of Notre Dame du Lac*, 93 F. Supp. 3d 906, 913 (N.D. Ind. 2015) (citing *Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 433 (6th Cir. 2014)). If even refusing to hold a birthday party for a public employee could be an adverse action if intended to punish for exercising free speech rights, then threatening a professional student with expulsion because of her protected speech is an adverse action. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 n.8 (1990).

Courts nationwide have also recognized that unfulfilled threats from government officials can chill an ordinary person's right to free

speech. *See Blankenship v. Manchin*, 471 F.3d 523, 530 (4th Cir. 2006); *see also Coszalter v. City of Salem*, 320 F.3d 968, 976–77 (9th Cir. 2003). In *Davis v. Robert*, for example, the court allowed a First Amendment retaliation claim to proceed against a government official whose alleged adverse action was asking the plaintiff's employer to consider terminating his employment. 192 F. Supp. 3d 847, 857 (E.D. Mich. 2016). There, the defendant did not even have the power to take a so-called "final" action against the plaintiff but could still be liable for First Amendment retaliation. *Id.*

Similarly, in *Brown v. Jones County Junior College*, the court held that even the *threat* of arrest by a college administrator is sufficient to deter a student of ordinary firmness from engaging in protected speech. 463 F. Supp. 3d 742, 760 (S.D. Miss. 2020). So too here. Voting to expel Diei for her speech not only would chill any ordinary student but *did* force Diei to self-censor protected speech that could be construed as "sexual" or "crude" daily. *Compl.*, R. 1, Page ID # 17. A closer look at *Benison* shows that Sixth Circuit precedent on adverse actions concerning students is not as limited as the Defendants claim.

19

In *Benison*, the plaintiffs were a tenured professor at Central Michigan University (CMU) and her husband, an undergraduate student at CMU. 765 F.3d at 654. Together, they filed a First Amendment retaliation claim asserting three separate adverse actions: (1) the denial of a promotional pay increase for the professor-wife, (2) the filing of a lawsuit by CMU officials against the couple, and (3) the placement of a hold on the student-husband's academic transcript. *Id.* at 659.

The Sixth Circuit held that the professor's denial of a promotional pay increase was not an adverse action because she resigned before CMU finalized its decision. *Id.* However, the Sixth Circuit also held that filing a lawsuit and placing a hold on a student's transcript were adverse actions. *Id.* at 660. Concerning the husband-student's claim, the court recognized that "a reasonable individual could have been dissuaded from engaging in protected activity by the *threat* of a transcript hold that prevented him from being able to" complete his education. *Id.* (emphasis added). The Sixth Circuit described this act as a "serious obstacle to the completion of an educational program[,]" which would deter students from exercising their First Amendment rights. *Id.* There is no question

20

that the Defendants' attempt to expel Diei is a more serious obstacle to completing graduate school than the transcript hold in *Benison*.

Contrary to Defendants' suggestion, *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) is on point here. *Defs. Br.*, COA R. 23, Page ID ## 39–40. In that case, students alleged that the university's bias response team objectively chilled their First Amendment rights based on the team's authority to refer students for punishment. *Schlissel*, 939 F.3d at 765. The Sixth Circuit agreed, explaining that even though the team's referral was not a punishment, "[t]he referral initiates the formal investigative process, which itself is chilling even if it does not result in a finding of responsibility or criminality." *Id.* (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963)).

True enough, *Schlissel*'s analysis is focused on the requirements for standing in a First Amendment case, not adverse actions under a retaliation theory. But the central question for both analyses is essentially the same: Has the government deterred students from exercising their First Amendment rights?

Like in *Schlissel*, where the bias response team could refer students for possible punishment, Chairperson George could initiate

investigations for possible punishment. *Compl.*, R. 1, Page ID ## 4–5. And far worse than the hypothetical concern in *Schlissel* or the transcript hold in *Benison*, Chairperson George did just that, voting to expel Diei for expressing "sexual" and "crude" viewpoints. *Id.*, Page ID # 16. If the mere prospect of referral for punishment and the threat of a transcript hold can impermissibly deter a reasonable student from speaking, so too does Chairperson George's vote to *expel* Diei. *Id.*, Page ID # 29.

Defendants attempt to shore up their "finality" theory by citing cases in the procedural due process context. *J. Endres v. Ne. Ohio Med. Univ.,* 938 F.3d 281 (6th Cir. 2019) and *Harris v. Blake*, 798 F.2d 419 (10th Cir. 1986), however, are even less persuasive. *Endres* involved a procedural due process claim where the court held that the statute of limitations began to run after a university completed its appeals process instead of when a university body initially voted to expel the student-plaintiff. *Endres*, 938 F.3d at 292. In contrast to Defendants' suggestion, *Endres* imports nothing from *Benison*, nor could it—the plaintiff did not bring a First Amendment retaliation claim.

*Blake* is similarly inapposite. There, the court held that a student-plaintiff's procedural due process claim failed because the university's

appeal procedure afforded him all the process the Constitution demands. *Blake*, 798 F.2d at 425. Again, just like *Endres*, *Blake* has nothing to do with the First Amendment or adverse actions.

In summary, the Sixth Circuit and courts nationwide have regularly held that non-final actions can deter ordinary citizens, including students, from engaging in protected speech. *Schlissel*, 939 F.3d at 765; *Benison*, 765 F.3d at 660; *Blankenship*, 471 F.3d at 530; *Coszalter*, 320 F.3d at 976–77; *Davis*, 192 F. Supp. 3d at 857; *Brown,* 463 F. Supp. 3d at 760. That's precisely what occurred here, and Defendant George cannot evade responsibility because her superior overturned the expulsion. At this pleading stage, Diei has sufficiently alleged that voting to expel her deterred her speech and would have deterred the speech of any reasonable student. *Compl.*, R. 1, Page ID ## 28–29. That's an adverse action.

## III. Defendants Boyd and George Are Not Entitled to Qualified Immunity.

Diei has demonstrated that Defendants are not entitled to qualified immunity because they violated her constitutional rights,[2] and those

---

[2] As shown in Sections I and II, Diei alleged facts to establish viable claims of First Amendment viewpoint discrimination and retaliation.

rights were clearly established. *Pl.'s Br.*, COA R. 20, Page ID ## 59–69. Defendants attempt to muddy the clear instruction of *Ward* and *Papish* by demanding precedent at a level of granularity the law does not require. *Defs.' Br.*, COA R. 23, Page ID # 56 ("Diei cites no relevant precedent forbidding schools from regulating off campus, online speech by students . . . ."). But demonstrating the law was clearly established does "not require a case directly on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Rather, "fair warning" is the "sine qua non of the clearly established inquiry." *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019) (affirming that conduct can violate the Constitution "even in novel factual situations.") (citations and internal quotation marks omitted). Thus, the Court should reject Defendants' bid for qualified immunity because they had fair warning that pretextually applying professionalism codes to discriminate against a student's viewpoint, whether online, offline, or on- or off-campus, was impermissible.

**A.    The law was clearly established that university administrators cannot use professionalism codes as a pretext to punish students' viewpoints.**

When Defendants investigated and voted to expel Diei, the law clearly established that universities cannot apply professionalism rules

pretextually to cover viewpoint discrimination. *See Pl.'s Br.*, COA R. 20, Page ID ## 61–65. Whether students speak on- or off-campus, online, or in person is immaterial; Defendants cannot engage in viewpoint discrimination.[3]

This Court's rulings make clear that school administrators may not "invoke curriculum as a pretext for punishing" a student because she expressed certain viewpoints. *Ward*, 667 F.3d at 734 (citation omitted). This holding, combined with the Supreme Court's ruling in *Papish*, defeats qualified immunity because Defendants punished Diei because of her viewpoint.

In *Papish*, the Supreme Court established that public university officials cannot silence students "in the name alone of 'conventions of decency.'" *Papish*, 410 U.S. at 670. There, the Court held the First Amendment protects a graduate student's distribution of an "indecent" cartoon *on campus* and *in person*. *Id.* at 667–71. Defendants attempt to

---

[3]    *Ward* held that viewpoint discrimination is not tolerated in kindergarten or graduate school. 667 F.3d at 734. Contrary to Defendants' suggestion, Diei's argument on the proper standard that applies to collegiate student speech, *Pl.'s Br.*, COA R. 20, Page ID# 63–64, has no bearing on whether it was clearly established in October 2020 that administrators could use a policy violation as pretext for viewpoint discrimination.

dismiss *Papish* as proposing "broad generalizations" that are not "particularized to the facts of the case." *Defs.' Br.*, COA R. 23, Page ID # 62. But as longstanding, directly relevant Supreme Court precedent, Boyd and George cannot evade *Papish*'s clearly established principle. Since 1973, university administrators like Defendants have known they cannot punish a graduate student for expressing a disfavored viewpoint under a rule prohibiting "indecent conduct or speech." *Papish*, 410 U.S. at 668. This holding has remained intact for over fifty years, yet Defendants censured Diei for supposedly speaking "crudely" online. If "indecent" expression is protected on-campus, it is protected off-campus and online. *Reno v. ACLU*, 521 U.S. 844, 870 (1997) (holding there is "no basis for qualifying the level of First Amendment scrutiny that should be applied" online).

The Sixth Circuit is not alone in clearly establishing that university administrators cannot hide behind professionalism rules to punish students for expressing views they dislike. As noted above, the Eighth, Ninth and Tenth Circuits do so explicitly. *Keefe*, 840 F.3d at 530; *Oyama*, 813 F.3d at 867–68; *Axson-Flynn*, 356 F.3d at 1292–93.

26

Defendants point to *Yoder* and *Hunt* to argue that whether colleges may regulate students' off-campus online speech was not clearly established. *Defs.' Br.*, COA R. 23, Page ID ## 57–58. Diei has argued that it was. *Pl.'s Br.*, COA R. 20, Page ID ## 63–64. But even so, fully settled law on "off-campus, online speech in the university setting" is not necessary to provide Defendants fair notice that they violated Diei's rights. *Defs.' Br.*, COA R. 23, Page ID # 57. Diei alleged Defendants used their professionalism rule as a pretext to punish her for her views. For decades, the law has emphatically prohibited viewpoint discrimination. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828–29 (1995). That principle applies whether online, offline, on or off campus.

Defendants also assert that "[t]he district court's application of the 'matter of public concern' context" to Diei's case "shows that this area of law" is unsettled, for non-lawyers like Defendants cannot be on fair notice of what the law requires if a district court judge is not apprised of a clearly established right. *Defs.' Br.*, COA R. 23, Page ID # 59. This is unpersuasive. First, this Court must review the denial of qualified immunity de novo. *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999).

Second, this Court has previously reversed district courts' grants of qualified immunity. *See, e.g.*, *McElhaney v. Williams*, 81 F.4th 550, 557–60 (6th Cir. 2023), *cert. denied*, No. 23-572, 2024 WL 218802 (U.S. Jan. 22, 2024). District courts can err without dooming a plaintiff's claim based on qualified immunity.

### B. The law was clearly established that university administrators cannot retaliate against students for expressing their viewpoints.

It was also clearly established that voting to expel a student in retaliation for protected speech was unconstitutional. "Ultimately, whether a speech-retaliation claim is clearly established at the pleadings stage rises and falls with whether the claim was sufficiently alleged," *Myers v. City of Centerville, Ohio*, 41 F.4th 746, 766 (6th Cir. 2022), and Diei properly alleged that she faced an adverse action at Defendants' hands because she expressed certain viewpoints. *Compl.*, R. 1, Page ID ## 23–24.

As Diei argued, *Pl.'s Br.*, COA R. 20, Page ID# 66, *Schlissel* established that "the threat of punishment from a public official who appears to have punitive authority can be enough to produce an objective chill." *Schlissel*, 939 F.3d at 764. Defendants claim *Schlissel* says nothing

about adverse action on the merits, but they ignore that alleging an objective chill is sufficient in First Amendment retaliation claims. *Benison*, 765 F.3d at 659. *Schlissel* supports denying Defendants qualified immunity because Diei alleged that Defendants' actions chilled her speech. *Compl.*, R. 1, Page ID ## 23–24.

Moreover, both President Boyd and Chairperson George had fair warning that their actions were unconstitutional for distinct reasons. Boyd had fair warning that enforcing an unconstitutionally vague and overly broad policy used to deprive students of their First Amendment rights violates the law. *See OSU Student All. v. Ray*, 699 F.3d 1053, 1076 (9th Cir. 2012) ("Advancing a policy that requires subordinates to commit constitutional violations is always enough for § 1983 liability . . . so long as the policy proximately causes the harm—that is, so long as the plaintiff's constitutional injury in fact occurs pursuant to the policy.")[4] As for Chairperson George, she had fair warning that taking *any action*, let alone expulsion, to deter Diei and other students from expressing "sexual" and "crude" viewpoints on social media would violate the First

---

[4] *See* Daugherty v. Campbell, 935 F.2d 780, 784 (6th Cir.1991) (noting the Sixth Circuit may look to the decisions of other circuits when determining whether a right is clearly established).

Amendment's long-standing prohibition on viewpoint discrimination. *See Rosenberger*, 515 U.S. at 829 ("Viewpoint discrimination is . . . an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."); *see also Robinson v. Hunt Cnty.*, 921 F.3d 440, 447 (5th Cir. 2019) (citing *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) ("[C]ensorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination.").

Finally, Defendants' critique of *Thompson* is misplaced, and this case also supports Diei's position that investigating and voting to expel her constituted retaliation. *Thompson v. Ohio State Univ.*, 990 F. Supp. 2d 801, 812 (S.D. Ohio 2014) ("[I]t is clearly established that a public official's retaliation against an individual for exercising First Amendment rights violates 42 U.S.C. § 1983."). Defendants refer the Court to "*Thompson II*," where the court granted qualified immunity to the professor who referred the plaintiff to the university's investigatory body after discovery. *Thompson v. Ohio State Univ.*, 92 F. Supp. 3d 719, 735 (S.D. Ohio 2015), *aff'd*, 639 F. App'x 333 (6th Cir. 2016). There, the

court granted qualified immunity on summary judgment because the plaintiff had not proved the "right to be free from a retaliatory referral to a neutral investigative body" was clearly established. *Id.* However, the plaintiff did not have evidence the referral chilled her speech, so the referral alone was insufficiently adverse. *Id.* ("[A]*bsent any injury from the investigation itself*, it is entirely unclear whether a referral to a neutral investigative body could violate a constitutional right.") (emphasis added). Diei's case is different. First, this case is at the motion to dismiss stage. Second, Diei did suffer an injury, as she self-censored for two years because of both the investigation and the vote to expel her. *Compl.*, R.1, Page ID # 28. *Thompson II* does not change the key point: Defendants were on notice that they could not investigate and vote to expel students in retaliation for their protected speech.

Because Chairperson George and President Boyd had fair warning that they could not hide behind professionalism rules to punish views they disfavored and that they could not retaliate against a student for her viewpoint, they are not entitled to qualified immunity.

## IV.    Diei's Requests for Declaratory Relief Are Not Moot.

The parties agree Diei's claims for damages remain live, but dispute only whether Diei's graduation moots her requests for retrospective declaratory relief against Boyd and George in their individual capacities. *Defs.' Br.*, COA R. 23, Page ID # 26.

A live damages claim ensures a personal stake for both sides, and the potential for declaratory relief is sufficient to prevent a claim for retrospective declaratory relief from being mooted by a student's graduation. *Crue v. Aiken*, 370 F.3d 668, 677 (7th Cir. 2004) ("When a claim for injunctive relief is barred but a claim for damages remains, a declaratory judgment as a predicate to a damages award can survive.") (citing *Wolff v. McDonnell*, 418 U.S. 539 (1974) and *Powell v. McCormack*, 395 U.S. 486 (1969)).

Here, declaring that Defendants violated Diei's rights is a predicate to her damages awards against Defendants Boyd (Count 4) and George in their individual capacities (Counts 4 and 5). President Boyd is liable because he enforced the unconstitutional policies against Diei, and this Court can issue a declaratory ruling to that effect. As for Chairperson George, she is liable because she applied the unconstitutional policy and

retaliated against Diei for protected speech, and, again, this Court can issue a declaratory ruling to that effect. With those declarations, Diei will be entitled to damages against both individuals in their personal capacities.

Defendants claim that *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381 (6th Cir. 2005) and *PETA v. Rasmussen*, 298 F.3d 1198 (10th Cir. 2002) do not support Diei's argument. *Defs.' Br.*, COA R. 23, Page ID ## 29–31. But those cases support Diei because they stand for the proposition that the Sixth and Tenth Circuits do not dismiss, as a matter of course, claims for declaratory relief when a student graduates. In *Blau*, the defendants argued that the court no longer had jurisdiction over the student-plaintiff's claims because he transitioned from middle school to high school. *Blau*, 401 F.3d at 387. This Court rejected that argument based on the plaintiff-student's damages claim but did not decide whether the plaintiff's declaratory relief claims must be dismissed. *Id.* Similarly, in *PETA*, the Tenth Circuit observed that claims for declaratory relief that require the court to determine if a past constitutional violation occurred are not moot simply because injunctive relief is no longer available to the plaintiff. *PETA*, 298 F.3d at 1202 n.2.

# CONCLUSION

For the foregoing reasons, Diei asks the Court to reverse the dismissal of Diei's Fourth and Fifth Causes of Action.

Dated: February 8, 2024                    /s/ Greg H. Greubel

GREG H. GREUBEL
  *Counsel of Record*
JT MORRIS
RAUL A. RUIZ
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street, Suite 900
Philadelphia, Pennsylvania 19106
(215) 717-3473
greg.greubel@thefire.org
jt.morris@thefire.org
raul.ruiz@thefire.org

*Counsel for Appellant*

## Certificate of Compliance With Type-Volume Limit

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f): this document contains 6,497 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.


Date: February 8, 2024          /s/ Greg H. Greubel
                                _____
                                Greg H. Greubel
                                FOUNDATION FOR INDIVIDUAL
                                  RIGHTS AND EXPRESSION

## CERTIFICATE OF SERVICE

The undersigned certifies that on February 8, 2024, an electronic copy of the Reply Brief for Appellant was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: February 8, 2024               /s/ Greg H. Greubel

                                      GREG H. GREUBEL
                                        *Counsel of Record*
                                      JT MORRIS
                                      RAUL A. RUIZ
                                      FOUNDATION FOR INDIVIDUAL
                                        RIGHTS AND EXPRESSION
                                      510 Walnut Street, Suite 900
                                      Philadelphia, Pennsylvania 19106
                                      (215) 717-3473
                                      greg.greubel@thefire.org
                                      jt.morris@thefire.org
                                      raul.ruiz@thefire.org